[Civ. No. 5983.   Third Appellate District.—February 10, 1939.]

HENRY PEDERSEN, Respondent, v. JOHN REYNOLDS et al., Appellants.

Irwin T. Quinn for Appellants.

Denver Sevier and Kenneth D. Sevier for Respondent.

THOMPSON, J.—The defendants have appealed from a judgment quieting title in plaintiff to 640 acres of grazing land in Humboldt County and determining that an old fence which was built in 1885 established the boundary line between their adjoining properties by acquiescence.

The controversy in this suit is over a strip of land 198 feet in width extending across the adjoining portions of the re-

spective ranches of the parties to this action. The strip is about three-fourths of a mile in length and contains 18 acres of land. The properties are rough and hilly and have never been cultivated. They were used chiefly as cattle ranges. The plaintiff bought his 640-acre ranch in 1924 from Ralston Pool, who purchased it from his mother in 1913. Ralston's father, W. A. Pool, bought the place in 1881, and constructed an old irregular fence across a portion of the southern part thereof in 1885 for the purpose of enclosing his cattle.

The defendant, Bertha Reynolds, inherited from the estate of her mother the 160-acre tract of land adjoining plaintiff's property on the south. Her father, W. O. West, bought that ranch in 1883. They did not live on the premises. It was sometimes leased for grazing purposes. Mr. West lived elsewhere and visited the ranch only occasionally.

There was never any dispute over the boundary line between these two ranches until the fall of 1935, when the plaintiff purchased posts and wire with which to reconstruct a fence across the southern border of his 640-acre tract. Only portions of the old fence then remained. It never did extend along the entire southern border of the land. It was quite irregular. It did not follow a straight line. There were several gaps in the line of fence which had never been built. The plaintiff explained that the fence was built to enclose cattle and that a portion of the southern border of his land was marked by bluffs, slides and abrupt ridges which turned his cattle without the necessity of enclosing such portions with a fence. When the plaintiff started to build his fence in 1935, along the line of the old fence, the defendants objected to that plan, denying that the old fence marked the true dividing line between their properties. After much dispute regarding that subject, during a period of a month or two, the plaintiff and defendants agreed to employ a surveyor to locate the true line. They hired Mr. F. A. McKee, a licensed surveyor of Fortuna. With the aid of the plaintiff and Frank Pool, a son of plaintiff's predecessor in title, Mr. McKee spent two days trying to locate and run the southern line of plaintiff's property. Starting from a point agreed upon by the respective parties, which was a government corner of a neighbor's property located by a surveyor of recognized ability and reputation by the name of Herrick, Mr. McKee finally located the plaintiff's southern line at the approximate distance of

198 feet north of the old fence. Mr. McKee acknowledged that location to be a "preliminary line" only. He said it would require several days' time and would cost them considerable money to complete the survey satisfactorily. The plaintiff rejected the surveyor's location as the true boundary line between his property and that of the defendants. No further survey was made. The respective parties shared equally the cost of employing Mr. McKee. There was then no agreement between them fixing the boundary line. Several months later this suit to quiet title was commenced by the plaintiff.

The complaint alleges title to the 640-acre tract of land in Humboldt County, described as the N. ½ of the S. E. ¼ of section 20, and the N. W. ½ of the S. W. ¼ of section 21, T. 2 N. of R. 2 West, H. M., and asserts that "The southern boundary of said property runs along and follows an old fence that was built in or about the year 1885, by W. A. Pool and W. O. West". The defendants answered the complaint denying the last-quoted paragraph. They also filed a cross-complaint, alleging that they are the owners of 160 acres of land adjoining plaintiff's land upon the south. The defendants' land is described as the S. ½ of the S. E. ¼ of section 20, the S. W. ¼ of the S. W. ¼ of section 21, and the N. W. ¼ of the N. E. ¼ of section 29, T. 2 N. of R. 2 West, H. M., containing 160 acres, according to the official plat of said survey.

The court adopted findings favorable to the plaintiff with respect to the disputed strip of land. It was determined that the boundary line between the respective properties of the plaintiff and defendants was established by acquiescence along the line occupied by the old fence, "except for those portions of said 'old fence' which had been built off the straight line for convenience sake". The court adopted no finding with respect to adverse possession, nor does the judgment refer to that character of asserted title.

A decree was rendered quieting title in plaintiff to his 640-acre tract of land, bounded on the south by the line of the old fence. It was determined that the 198-foot strip of land in dispute was acquired by plaintiff by acquiescence. The decree provides in that regard:

"That the southern boundary of plaintiff's said property described above, runs along and follows an 'old fence' that

was built on or about the year 1885 by W. A. Pool, except for those portions thereof which had been built off the straight line of said fence for convenience sake.''

The decree also quiets title in defendants to their 160-acre tract of land above described. From that judgment the defendants have appealed.

It is asserted the findings and judgment are not supported by the evidence; that there is no substantial proof of the elements necessary to constitute the establishment of a boundary line between the lands of the plaintiff and defendants by acquiescence.

■   We are convinced the findings and decree to the effect that the boundary line between the lands of the plaintiff and defendants was established by acquiescence along the line of the old fence which was built by W. A. Pool in 1885, is not supported by the evidence. There is no proof of a disagreement or dispute over the boundary line between the former owners of the respective parcels of land. There is no evidence that Mr. West, the father of the defendant Mrs. Reynolds, who formerly owned the 160-acre tract, ever talked with Mr. Pool, the plaintiff's predecessor in title, about the location of the boundary line of their properties. There was no controversy about the line. There was apparently no uncertainty regarding the line. No effort was made by anyone to ascertain the true line. In 1885 the land was of small value. It was never cultivated. It was used chiefly for grazing stock. It was rough and rugged, containing ridges, bluffs and slides in the vicinity of the line in controversy. Mr. West lived in Ferndale and seldom visited his ranch. The record clearly indicates that Mr. Pool built the irregular, disconnected portions of fence without consulting Mr. West, as a mere temporary convenience to prevent his stock from straying to distant points. There is no evidence that Mr. West did not know exactly where his boundary line was located. The evidence refutes the assertion that Mr. Pool was uncertain regarding the location of his line. His son testified that he built the fence on a line with a government corner stake which was pointed out to him by the person from whom he purchased the land. Mr. Pool made no effort to locate a different line by inquiry, searching, surveying or otherwise. He accepted the government corner stake as evidence of the true line. He did not extend the fence across

the southern boundary. It contained several gaps at points where steep bluffs, abrupt declivities and sharp ridges furnished natural barriers to turn the stock. The old fence was not built by agreement of the parties. The location of their boundary line was never disputed or questioned between them. Mr. West took no part in locating or building that fence. He did not object to it because it was an accommodation to his neighbor, and he expected it to be changed to the true line when he wanted to use the land. He knew the fence was not on the proper line, and told his son the true line was some distance north of the fence, explaining why he did not object to its being built and used in that temporary location. Moreover, the position of the fence was not a compromise on the part of Mr. Pool. He believed he was building it on the true line. There was no uncertainty regarding the correct location of that boundary line by either party. Their respective deeds accurately and clearly described their separate properties. A definite government corner from which a correct survey could be made was located and marked by a reputable surveyor, at the corner of the property of their neighbor, Smith, half a mile to the east. The field notes for those surveys were also available. Their boundary line could have been easily and accurately established. There is no proof to the contrary. There is therefore neither lawful reason nor valid excuse, under the circumstances of this case, for the parties to have acquiesced in locating an uncertain boundary line.

The only material evidence regarding the establishment of a boundary line between the properties of the plaintiff and defendants, upon which the respondents rely, is the following:

Frank Pool, a son of the plaintiff's predecessor in title, was twelve years of age at the time the fence was built. He testified that he helped his father construct that fence for the purpose of enclosing their cattle; that Mr. West, the owner of the adjoining 160-acre tract, did not assist in building the fence. The witness had not heard of any dispute over the division line between the properties of his father and Mr. West, nor with anyone else. He said that his father built the fence on a line with a government post, representing "the actual Government corner" which was shown to him by the man from whom he purchased the land; that he had never

heard of Mr. West objecting to the location of the fence after it was built, and that they had paid all taxes on "the land *described in those deeds*".

Ralston Pool, another son of W. A. Pool, who was eight years of age when the fence was built, testified that he did not help build the fence, but that it was constructed "for the purpose of keeping the stock from going backwards and forwards"; that he had heard of no objection to the building of that fence, and that *as far as he knew* it was agreed to by both parties.

Mr. Harvey Dean, who lived near the Pool ranch and who worked for W. A. Pool for three years, testified that he knew the "Pool place up on the Wildcat"; that he helped build the fence in question. He testified to no dispute and to no conversation between Mr. Pool and Mr. West regarding the location of the boundary line between their respective properties. To the question, "Did you ever hear any objection from them as to that being the division line between the two properties?" he replied, "Not that I know of".

The plaintiff, Mr. Pedersen, testified that he bought the land from the Pools in 1924; that he never talked with any of his predecessors in title about the location of the boundary line; that he made no investigation regarding that boundary; that no question regarding the boundary line ever arose until the fall of 1935, when he purchased wire and posts to replace the old fence along the same line it formerly extended; that the defendants then denied that the line of the old fence was the true boundary line, and after a dispute which lasted two months they agreed to hire a surveyor and divide the expense of running a true line; that they did employ Mr. McKee for that purpose and that the witness helped him survey the line, and also paid one-half of his fees; that McKee merely ran a preliminary line, which was 198 feet northerly from the old fence, and that the plaintiff therefore rejected that location as the true boundary line.

Ernest West, a son of W. O. West, who was about ten years of age when the fence was built, testified that there never was any dispute or controversy over the boundary line; that Mr. Pool built the fence himself for his own convenience to keep his stock from straying to other property; that he located the fence along that line because it required less fencing and cost less to enclose the range there for the

reason that certain cliffs and bluffs helped form natural barriers; that his father had nothing to do with locating the fence, but did afterward tell the witness the boundary line was north of the old fence, and that Pool had constructed it at that place as a matter of convenience to save himself money in fencing. Mr. West said:

"Later on they told me . . . that fence wasn't on the line . . . and my father told me it was further north. . . . I can remember asking my father why Mr. Pool built the fence there, why he didn't build in on the line. Well, he says, that bluff over there saved a quite a bit of fencing . . . and consequently they put it down there, and the land involved at that time didn't make so much difference. . . . It was so far away from our house . . . it wasn't worth while to go up there and cultivate it. . . . Mr. Pool built most of the fence, and these fences were built to save him . . . all he could, and he built them where it was most convenient, and Mr. Pool at one time said, 'when we get around to it we will put the survey through and put them as near as we can on the line, but at this time it's all right, you don't care and I don't care, he says, *so we will put the fence wherever it's most convenient'.*"

The foregoing evidence indicates that the old fence was built as a mere convenience to plaintiff's predecessor in title to take advantage of natural barriers and save the cost of additional fencing, and not as a compromise of a dispute or an uncertainty regarding the true line.  ▮   It may not be said a boundary line is unknown when the descriptions in the deeds are certain and accurate and the evidence is readily available from government monuments, field notes and fixed corners in the immediate neighborhood, from which to ascertain the true line.  When a fence is built along an arbitrarily accepted line as a mere accommodation or convenience to the builder thereof without any mutual purpose or understanding to thereby locate an uncertain boundary line between coterminous owners of land, the fence may not be said to establish the line by acquiescence and the owner is not estopped from thereafter claiming title to the true line.

In the case of *Clapp* v. *Churchill*, 164 Cal. 741 [130 Pac. 1061], the appellants sought to establish title by acquiescence to a strip of land five feet wide by five hundred and ninety

feet in length. A nonsuit was granted and that order was affirmed by the Supreme Court. It is there said:

"The case is one where plaintiffs to prevail must establish an uncertain boundary line, an agreement between the coterminous owners *to fix that boundary line and the fixing of that line by agreement,* or must establish their title by adverse possession. . . .

" . . . This is substantially the testimony to support plaintiffs' case. *It is silent upon several important matters. There is no word of testimony that the defendants, or any one of them, believed or declared their northern boundary line to be uncertain.* There is no testimony about any agreement fixing the pomegranate hedge as the accepted boundary line because of such uncertainty, and the whole case of the plaintiffs resolves itself down to this, that plaintiffs did not know where the boundary line called for by their deed was, but supposed it to be the pomegranate hedge. There was no uncertainty even upon the face of the deed. . . . Plaintiffs exercised certain acts of dominion and control over the disputed strip. . . .

"But the doctrine of an agreed boundary line and its binding effect upon the coterminous owners rests fundamentally upon the fact that there is, or is believed *by all parties to be,* an uncertainty as to the location of the true line. When that uncertainty exists, or is believed by them to exist, they may amongst themselves by agreement, fix the boundary line, and that agreement will bind all the consenting parties. Acquiescence is merely evidence of the agreement and can properly be considered as evidence of an agreement only when a formal agreement would itself have been made a binding contract. But a formal agreement to fix a boundary line is not valid, *indeed is void, if the parties know, or one of them knows,* that the agreed line is not the true line, or, in other words, if there be not an actual or believed uncertainty as to the true line."

The preceding language fits the present case exactly. The evidence shows without conflict that the predecessor in title of plaintiff built the disputed fence opposite a government stake which he assumed marked the true line. He was not uncertain about the location of that line. He thought he actually built the fence on the true line. On the contrary, Mr. West told his son, Ernest, that the fence was not on the proper

line; that Mr. Pool built it there as a mere convenience to himself, and he said that the boundary was further north than the location of the fence. Mr. West was not uncertain regarding the location of that line. He knew the fence was not built along the real boundary. So neither party was uncertain about the matter.

In the Clapp case, *supra,* it is further said that the evidence which will warrant a finding of title by acquiescence must disclose,

"A valid pre-existing agreement and to be valid that agreement must have been based on a doubtful boundary line. But . . . this inference of a doubtful boundary will not prevail against the proved fact to the contrary,—namely, that there was no question or doubt or dispute *between both parties* over the boundary."

The foregoing essentials to title by acquiescence are elaborately covered by an excellent brief found in 69 American Law Reports, 1431, note. ■ It is true that an agreement between coterminous property owners to establish an uncertain boundary line, need not necessarily be by express agreement, but may be inferred from the conduct of the parties by acquiescence therein for the statutory period of time. (*Vowinckel* v. *N. Clark & Sons,* 217 Cal. 258 [18 Pac. (2d) 58]; 1 Tiffany on Real Property, 2d ed., 999, sec. 295.) But the conduct of a party which will warrant such an inference must be clear and satisfactory. The mere permissive use of a fence on an owner's land for the accommodation of the adjoining property owner is not sufficient upon which to base such an inference. In this case both parties refuted by affirmative declarations and by their conduct that there ever was a dispute, an uncertainty or an agreement regarding the boundary line between their lands. Such a situation will not support a finding of title by acquiescence. (4 Thompson on Real Property, p. 196, sec. 3105, p. 212, sec. 3117.)

It has been definitely held that acquiescence in the maintenance of a fence merely for the purpose of enclosing cattle, or for other convenience of the adjoining land owner, without an agreement that the fence shall become the boundary line between their lands does not constitute an estoppel which will prevent the real owner from subsequently claiming his property. (*Moniz* v. *Peterman,* 220 Cal. 429, 435 [31 Pac. (2d) 353]; *Staniford* v. *Trombly,* 181 Cal. 372 [186 Pac. 599];

*Grants Pass Land & Water Co.* v. *Brown,* 168 Cal. 456 [143 Pac. 754].) In 4 Thompson on Real Property, at page 197, section 3105, it is said:

"Where one owner merely permits an adjoining owner to construct a fence on an asserted boundary line, he is not estopped thereby from questioning the correctness of such line."

And at page 210, section 3115, of the last-mentioned text book, it is said:

"An agreement or acquiescence in a wrong boundary when the true boundary is known, *or can be ascertained from the deed,* is treated both in law and equity as a mistake, and neither party is estopped from claiming the true line."

Likewise, at page 212, section 3117, of the same authority, it is said:

"A fence between adjoining owners, placed by mistake on a line different from the true boundary line, does not estop the owner upon whose land the fence stands from claiming up to the true line."

All of the authorities cited in the briefs in this case may be readily reconciled with the foregoing principles determining title by acquiescence which must be present to constitute a binding location of a boundary line between coterminous property owners.

In the case of *Price* v. *De Reyes,* 161 Cal. 484 [119 Pac. 893], the judgment of the trial court was reversed because the record disclosed the fact that there was a definite uncertainty regarding the true line between the coterminous owners of land; that they actually agreed to a specific boundary line; that the agreement was followed by occupancy on the part of both owners up to the stipulated line, and that they thereafter constructed valuable improvements on their respective sides of the agreed line. The syllabus to that case correctly states the principle upon which the judgment was reversed, as follows:

"Where coterminous landowners, being uncertain of the true position of their common boundary line, agree upon its true location, mark it upon the ground, or build up to it, occupy on each side up to the place thus fixed and acquiesce in such location for a period equal to the statute of limitations, or under such circumstances that substantial loss would

be caused by a change of its position, such line becomes, in law, the true line called for by the respective descriptions.''

There is nothing in that case in conflict with what we have previously said regarding title by acquiescence.

All of the other cases relied on by the respondent may be likewise reconciled. There is no substantial evidence in this case, nor are there reasonable inferences which may be drawn therefrom in support of the findings and judgment that plaintiff acquired title to the disputed strip of land by acquiescence.

Nor is there any evidence that the plaintiff acquired title to that 198-foot strip of land by adverse possession. The trial court did not adopt a finding to that effect. Nor does the judgment so determine. The evidence conclusively shows that the plaintiff and his predecessors in title merely paid taxes on the land described in their deeds, which make no reference to the disputed strip of land. Title by adverse possession may not be acquired in the absence of payment by the claimant and his predecessors in title of ''all the taxes, state, county or municipal, which have been levied and assessed *upon such land''*. (Sec. 325, Code Civ. Proc.) It follows that the holders of the deeds which actually contain within their descriptions the disputed strip of land, paid the taxes thereon. There is no substantial evidence it is included in the general description of plaintiff's 640-acre tract. Therefore he failed to establish title to that strip by adverse possession.

The appellants request this court to direct a judgment quieting title in them to their 160-acre tract of land to the line on their northerly boundary located by the surveyor, Mr. McKee, which includes the 198-foot strip of land in controversy. This we may not do for lack of satisfactory evidence. In a suit to quiet title to land, a litigant must prevail on the strength of his own title. Satisfactory proof of title should be adduced. Mr. McKee testified that the line which he believed to be the true boundary line between the tracts of land was merely a ''preliminary line''. He said it would require about five days' work to complete the survey. The court has quieted title in defendants to the land described in their cross-complaint. This assures them of title to their 160-acre tract of land wherever the true lines may be located.

The judgment, to the extent to which it purports to quiet title in plaintiff to his 640-acre tract of land bounded on the south by the old fence which was constructed in 1885, from which the defendants appeal, is reversed, and the court is directed to render judgment against the plaintiff to the effect that he take nothing by his action. The appellants may recover costs on appeal.

Tuttle, J., and Pullen, P. J., concurred.