[Civ. No. 18142. Third Dist. Dec. 12, 1979.]

ALBERT W. FINLEY et al., Plaintiffs and Appellants, v.
YUBA COUNTY WATER DISTRICT et al., Defendants and
Respondents.

COUNSEL

Goldstein, Barceloux & Goldstein, P. M. Barceloux, Burton J. Goldstein, Ralph Golub, Keith S. Humpherys, Ronald E. Stewart, M. Reed Hunter, John J. Dacey and Barbara R. Banke for Plaintiffs and Appellants.

Arthur S. Powell for Defendants and Respondents.

OPINION

WARREN, J.*—Plaintiffs appeal from a judgment refusing to quiet title in them to a triangular strip of land which lies at one end of their property between certain properties of the defendants. ▉ They claim title through (1) their interpretation of certain surveys, (2) the doctrine of agreed boundaries, and (3) adverse possession. Defendants, who are adjoining landowners, claim title through their own interpretations of the surveys and deny that there was an agreed boundary or adverse possession.

The lands in the general area are hilly and covered with brush and timber, although some of it is meadow or otherwise suitable for cattle grazing. The strip in question contains both types of terrain.

For at least the past 80 years, plaintiffs and their predecessors have used their land for cattle grazing, and have at times leased portions of

*Assigned by the Chairperson of the Judicial Council.

▉

defendants' lands for that purpose. All these lands have also sustained timber and mining operations.

The original and official survey of the boundary line in question was made in 1871 by a government surveyor. As was the custom in those days, he often made reference to both natural and manmade objects such as trees, fences and mine excavations in plotting his measurements and directions. Some of these objects have ceased to exist, thus causing considerable difficulty in duplicating his determinations.

In 1893 the line was again surveyed, this time by a private surveyor who staked the line every 5 chains (330 ft.). Plaintiffs surmise that their predecessors shortly thereafter erected a fence along that line and that the same fence has been maintained in that position ever since. However, no one knows when the fence was put up or who erected it, except that it apparently existed at least from the turn of the century. This surveyor's monuments, witness trees and stakes have never been found.

In recent years, three private surveys were run, one of which tends to support plaintiffs' theory as to where the historic boundary line was set, and two of which tend to support the defendants' contentions. The trial court ruled in favor of defendants on this issue, and we can see no reason to disturb its findings in this regard. ■■ ■■ Plaintiffs specifically complain that the trial court mistakenly adopted the proportionate measurement technique used by the surveyors relied on by defendants in locating a corner of the properties, but under the facts herein we find no error in its so doing.[1]

---

[1] The two *section* corners set by the government surveyor are not in issue. The *quarter corner* between these two agreed corners is the one in dispute, for the government surveyor's markings of this corner have not been found by any of the three surveyors whose determinations are in question.

The survey upon which plaintiffs rely was made largely in reference to now nondiscernible "ravine diggings" described by the notes of the government surveyor. Plaintiffs claim that since a ravine still exists in the general area, the ravine itself is sufficient identification of the "diggings" to support measurement and distances from that point. The surveyors upon whom defendants rely felt that the reliability of this reference point was too speculative and therefore drew a line between the two known corners and set the quarter corner at a point halfway between. They thus used what is called "single proportionate measurement" which is a new measurement made on a single line to determine the position of a lost corner. (Grimes, A Treatise on the Law of Surveying and Boundaries (4th ed. 1976) § 389, pp. 481-488; see also U.S. Bureau of Land Management Technical Bull. 6, Manual of Instructions for the Survey of the Public Lands of the United States (1973) pp. 136-137; U.S. Dept. Interior, Bureau Land Management,

■ The two crucial issues of the case are plaintiffs' claims of ownership via the theory of adverse possession and the doctrine of agreed boundaries. We address ourselves to these concepts with particularity, for there tends to be confusion among both lawyers and others as to what they encompass. Such confusion is understandable, for although they have often been discussed in treatises and appellate cases as being similar in nature, the fact is that they are only obliquely related.[2]

The aspects in which they relate to each other are that they have both been effectively used to resolve land disputes, impart stability to geographical areas in contested ownership, and provide for equitable solutions. But thereafter they part company, for each is founded on different principles.

As to adverse possession, its underlying philosophy is basically that land use has historically been favored over disuse, and that therefore he who uses land is preferred in the law to he who does not, even though the latter is the rightful owner.[3] Hence our laws of real property have sanctioned certain types of otherwise unlawful taking of land belonging to someone else, while, at the same time, our laws with respect to other types of property have generally taken a contrary course. This is now

Restoration of Lost or Obliterated Corners and Subdivision of Sections (1975 ed.) pp. 12, 16-19.)

The proportionate measurement method may be used when the corner is "lost," but not if it is merely "obliterated." (*Chandler* v. *Hibberd* (1958) 165 Cal.App.2d 39, 52 [332 P.2d 133].) An "obliterated" corner is one where there are no remaining traces of the monument, or its accessories, but whose location has been perpetuated, or the point for which may be recovered beyond reasonable doubt by testimony or some acceptable record evidence. A "lost" corner is a point of survey whose position cannot be determined beyond reasonable doubt either from traces of the original marks or from acceptable evidence, and whose location can be restored only by reference to one or more independent corners. (Grimes, *op. cit. supra,* § 381, pp. 464-466; Technical Bull. 6, *op. cit. supra,* at pp. 130-133; Restoration, etc., *op. cit. supra,* at pp. 9-10.)

There was sufficient evidence to justify the trial judge's conclusion that the corner in question was "lost" and we will not upset that finding on appeal.

[2]E.g., see 32 Harvard L.Rev. 135 (1918-19); 9 Santa Clara Law. 244 (1968-69); 11 Stan. L.Rev. 720 (1958-59); 7 Powell on Real Property (1977), page 709; 4 Cal. L.Rev. 293 (1915-16). Note in these authorities the additional discussions of the correlative theories of prescription and estoppel.

[3]"[A]cquisitive prescription [adverse possession] is founded upon the economic conception that all things should be used according to their nature and purpose. The man so using a thing, and using and preserving it for a certain length of time, has done a work beneficial to the community. He deserves well of the state, and his reward is the conferring upon him of the title to the thing used." (Note, Teisen (1917) 3 A.B.A.J. p. 127.) Note also in this article the summary of the historical background of prescriptive rights and adverse possession concepts throughout the western world.

largely justified on the theory that the intent is not to reward the taker or punish the person dispossessed, but to reduce litigation and preserve the peace by protecting a possession that has been maintained for a statutorily deemed sufficient period of time. Therefore, the present provisions for adverse possession are usually termed statutes of repose.

Quite naturally, however, dispossessing a person of his property is not easy under this theory, and it may even be asked whether the concept of adverse possession is as viable as it once was, or whether the concept always squares with modern ideals in a sophisticated, congested, peaceful society. For instance, environmental concerns may sometimes result in relative disuse being more in the public welfare than are uses which disrupt the land's more primitive condition.

■ Yet this method of obtaining land remains on the books, and if a party proves all five of the following elements (*West* v. *Evans* (1946) 29 Cal.2d 414, 417 [175 P.2d 219]), he can claim title to another's land: (1) possession by actual occupation under circumstances sufficient to constitute reasonable notice to the owner's title; (2) possession hostile to the owner's title; (3) possession whereby the holder claims the property as his own under either color of title or claim of right; (4) continuous and uninterrupted possession for five years; (5) the holder has paid all taxes levied on the property during those five years.

In the case at bar, plaintiffs contend that they and their predecessors were in adverse possession of the land in question for at least 50 years. It seems to be conceded that they used the property openly for that time, but whether it was a "hostile" holding and whether taxes were paid on the property fall in the area of legitimate debate.

As to the issue of taxes, there was no separate assessment for the parcel in dispute, but plaintiffs claim that they and their predecessors were surely taxed on the strip of land because the only physical dividing line between the properties was the fence and because there was a corral and some apple trees on their side of the fence. They cite *Price* v. *De Reyes* (1911) 161 Cal. 484, 490 [119 P. 893], in which the Supreme Court said: "[T]he natural inference would be that the assessor put the value on the land and improvements of each party as disclosed by the visible possession, rather than that he ascertained the true line by a careful survey and assessed to one a part of the possessions of the other."

Defendants reply that plaintiffs claim to have purchased only 160 acres of land whereas even the surveys which defendants rely on put 164 acres in plaintiffs' tract. Hence they reason that the assessor would assess plaintiffs' land according to plaintiffs' deed and not physical markings. They further point to plaintiffs' testimony that plaintiffs had not paid any taxes on improvements (e.g., the corral) to the property. In making this argument, they point to *Pedersen* v. *Reynolds* (1939) 31 Cal.App.2d 18, 29 [87 P.2d 51], which states: "The evidence conclusively shows that the plaintiff and his predecessors in title merely paid taxes on the land described in their deeds, which make no reference to the disputed strip of land. Title by adverse possession may not be acquired in the absence of payment by the claimant and his predecessors in title of 'all the taxes, state, county or municipal, which have been levied and assessed *upon such land*.'(Sec. 325, Code Civ. Proc.)" (Original italics.)

Finally, plaintiffs seem to concede that the question as to who paid the taxes on the strip was largely a question of fact for the trial court, for they state in their reply brief: "The question of whether appellants or respondents paid such taxes is included in the ultimate issue of where the boundary lies and the resolution of this issue will determine who paid the disputed taxes. Without resolution of the threshold boundary issue, it cannot be definitely demonstrated that either appellants or respondents paid the taxes."

While we need not reach the issue of the accuracy of this statement, we agree that under the facts of this case the question of who paid the taxes was basically a question of fact for the trial judge and not one which is determined solely by statutory and case law.[4]

The next question which must be resolved is whether the holding was "hostile" within the context of the adverse possession laws.

At this point, the trial court was faced with two apparently conflicting theories advanced by plaintiffs: (1) that defendants and/or their predecessors agreed that the strip belonged to plaintiffs through the doctrine of agreed boundaries, and (2) that plaintiffs held the land in a manner hostile to the defendants and their predecessors. Plaintiffs appear to contend that if the holding was not consensual then it was

---

[4]For incisive discussions of the requirement to pay taxes see 9 Santa Clara Law. 244 (1968-69), 37 Cal.L.Rev. 477 (1949); 11 Stan. L.Rev. 720 (1958-59).

certainly hostile in that their possession was such as to constitute reasonable notice to the owners that they were asserting an adverse claim. In this regard, they point to the facts that they and their predecessors maintained the fence, pastured cattle in the area, used the corral and harvested the apple trees over a period of many years. Defendants respond that there is equally persuasive evidence showing that such possession and use was likely consensual, that the fence was for the benefit of defendants, plaintiffs, and their respective predecessors, and that it was never intended to establish the boundary lines between any of their properties. Hence they claim that plaintiffs have failed to carry their burden of proof in regard to either theory.

■ These facts lead to a discussion of the theory of the doctrine of agreed boundaries.

Plaintiffs correctly state that the bases for this doctrine are that when there is uncertainty as to the true boundary between coterminous owners, such owners may, expressly or by implication, fix a boundary line by a fence or otherwise. Acceptance or acquiescence in the line so fixed for a period equal to that prescribed in the applicable statute of limitation (five years) establishes the agreed boundary as the actual boundary. The object of this rule is to secure repose, to prevent strife and disputes concerning boundaries and make titles permanent and stable. As early surveys were often inaccurate, and the monuments and corners set by early surveyors may have vanished, courts have often relied on the doctrine of agreed boundaries to settle disputes. In cases of doubt and uncertainty, courts have been favorably disposed toward private agreements designating boundary lines. Uncertainty as to the location of a boundary may be proven by direct evidence or inferred from the circumstances surrounding the parties at the time when the agreement is deemed to have been made. An agreed boundary line may be established deliberately, by acquiescence or by mistake. Therefore, a boundary established pursuant to the doctrine of agreed boundaries supersedes the original true boundary should that boundary and the variance be subsequently discovered.[5]

Hence the doctrine is a useful tool in resolving many property disputes and is rightfully given high status in the law. It achieves this status because it is not only often an equitable basis for deciding diffi-

---

[5]Defendants do not contest these foundational considerations, and the law is so settled in this regard that it is unnecessary to give supporting citations.

cult issues, but because our legal system strongly favors the resolution of disputes, and the prevention of possible future disputes, by amicable private agreements.

■ However, it is not and was never intended to be a means of divesting an unconsenting landowner of his property as is the case with the laws pertaining to adverse possession. It is not intended to subvert neighborliness or prudence whereby a neighbor allows another to use part of his land for the neighbor's (or their mutual) benefit, and this concept grows in importance as we progressively become a more congested society.

Therefore, the mere fact that a landowner allows his neighbor to occupy or use part of his land does not automatically fix the boundary between them or give the neighbor a right to use or take the property in perpetuity. The doctrine rightfully rests on the intent of the parties, and determining such intent is the province of the trier of fact.

As a corollary to the foregoing discussion of the doctrine of agreed boundaries, it is antithetical to assert that if an occupying neighbor cannot show that the landowner agreed to set a boundary by consent the neighbor is thereby invariably entitled to obtain title to the occupied property via the theory of adverse possession. That is why the requirements of adverse possession are rigid, precise and must be construed in favor of the person sought to be dispossessed. (*Myran* v. *Smith* (1931) 117 Cal.App. 355, 360 [4 P.2d 219].)

■ In the instant case, there was evidence that: (1) Although the fence line roughly followed the boundary claimed by plaintiffs, it "meandered," was tacked to trees in many places and had partly collapsed; (2) Plaintiffs often leased the adjacent land from defendants' predecessors for the grazing of their cattle. Equally importantly, there was no evidence indicating: (1) that the boundary line was uncertain at the time the fence was constructed; (2) exactly when the fence was put up, who put it up, and as to why it was put up[6]; (3) who erected the corral, when it was erected, why it was erected, and why plaintiffs were able to use it; (4) who planted the apple trees, when they were planted, why they were planted, and why plaintiffs were able to harvest them.

---

[6]Of significance is the fact that the laws pertaining to the question as to whether the owner of cattle must fence his cattle in or whether his neighbors must protect them-

Based on this state of the evidence, the trial court could reasonably find, as it did, that plaintiffs had not carried their burden of proof under any of their theories.[7]  ▮  In this regard we note that "[i]t is fundamental that a party who would quiet his title must prevail, if at all, on the strength of his own title and not on the weakness of the claims of an adversary." (*Hudson* v. *West* (1957) 47 Cal.2d 823, 831 [306 P.2d 807].)

The judgment is affirmed.

Regan, Acting P. J., and Janes, J.,* concurred.

---

selves by fencing the cattle out have been uncertain and in a state of flux over the periods involved, thus raising a substantial question as to the purpose of the fence. (See 5 Powell on Real Property (1977) §§ 692-693, pp. 249-254.)

[7]The trial court found that "There is a meandering fence that is obviously not (nor was it ever) intended to follow the boundary line. No one could ever have relied on it to set an intended or acquiesced boundary. It (the fence) is very old. It is tacked on trees in many places but has very old fence posts in places. Immediately west of the fence is an old corral and some 8 old apple trees. [¶] ... The plaintiffs for many years following 1951 leased the southwest quarter of Section 22 so that the area of use (trees and corrals) was of no significance. The corral and trees seem probably placed in the area in question because the fence was placed in its location. The trees could have been planted without reference to anything.... The corral could have been made for the use of the southeast quarter and then merely tied on for use of the southwest quarter. Nothing can be concluded from the trees or corral."

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.