Fernando SALAZAR and Richard
Pretto, Petitioners,

v.

Gail TERRY, individually and as the Personal Representative of the Estate of
Bill Powers, Jr., a/k/a William B. Powers, Jr., Respondent.

No. 94SC704.

Supreme Court of Colorado,
En Banc.

Feb. 12, 1996.

Rehearing Denied March 18, 1996.

Alison Maynard, Denver, for Petitioners.

Gary E. Hanisch, Walsenburg, for Respondent.

Justice MULLARKEY delivered the Opinion of the Court.

We granted certiorari on the issue of whether a one hundred-year old division fence lost its identity as a boundary dividing two parcels of land because title to the land on both sides of the fence was acquired and held by one entity for a fifteen-day period in 1977.[1] The court of appeals, overturning the decision of the trial court, held that the fence lost its legal significance as a boundary when the two parcels of land were held under common ownership for a period of fifteen days. *Terry v. Salazar*, 892 P.2d 391 (Colo. App.1994). We affirm the court of appeals.

## I.

In 1991, the respondent, Gail Terry (Terry), individually and as personal representative of the Estate of Bill Powers, Jr., brought an action to quiet title against the petitioners Fernando Salazar and Richard Pretto (hereinafter jointly Salazar). Salazar owns a tract of land (the Salazar Tract) adjoining Terry's 80–acre property (the Terry Tract). Both properties are located in Huerfano County, Colorado. The Salazar Tract surrounds the Terry Tract on three sides, the north, west, and east.[2] A substantial fence erected in 1888 runs roughly parallel to the government subdivision lines between the two properties. The fence, which runs in a north-south direction, is located at the western boundary of the Terry Tract and at the eastern boundary of that portion of the Salazar Tract. The deeds transferring both tracts of land consistently have referred to the government subdivision lines and not the fence as the boundary.

This action was precipitated when Terry hired a private surveyor and discovered that the fence is not located on the government subdivision lines described in her deed. According to Terry's testimony at trial, her privately commissioned survey revealed that the deviation between the government subdivision lines and the fence varies anywhere from 100 to 160 feet along her property's western boundary. By Terry's reckoning, the fence is east of the government subdivision lines and is located inside the Terry Tract. Hence, Terry claims that the fence is not the true boundary between the parties' parcels of land and that the description in their deeds, *i.e.*, the government subdivision lines, should prevail.

1. We granted certiorari on the following issue: Whether a hundred-year old fence, historically recognized by the landowners on both sides to be the boundary, lost its identity as such "as a matter of law" because title to both sides of the fence was acquired and held by one entity for a fifteen-day period.

2. A large map of the properties was submitted as evidence during the trial but is not part of the record on appeal. Salazar's opening brief describes the Salazar Tract as surrounding the Terry Tract on three sides, the north, west, and east. This description is not challenged by Terry.

In response, Salazar claimed adverse possession and asserted a counterclaim that the fence line was acquiesced in and recognized by the parties or their predecessors in title for twenty years under the terms of section 38–44–109, 16A C.R.S. (1982). Salazar also counterclaimed for trespass. Salazar alleged that, in an effort to catch seepage water, Terry entered the Salazar Tract in March or April of 1989 and excavated and constructed a dam with a ditch leading to her property. The dam was located approximately 150 feet away from the fence line. Salazar further alleged that in May of 1992, Terry instructed someone to break through portions of the fence and dig a hole, 75–90 feet in diameter and 20 feet deep, on the Salazar Tract. Terry does not dispute these allegations. Rather, Terry contends that the actions took place on the disputed strip of land between the fence and the government subdivision lines which is her property under the deed.

Mills Ranches, Inc. (Mills Ranches) acquired the land presently owned by Salazar in 1971 and held it until 1979 when Mills Ranches lost the property in a bank foreclosure sale to Travelers Insurance Company. In 1989, Travelers Insurance Company sold the land to Salazar. On November 3, 1977, Mills Ranches acquired the land now owned by Terry and, on November 18, 1977, conveyed it by warranty deed to Jerry Mills. Jerry Mills conveyed the land to Terry's predecessor in title and Terry subsequently acquired the property on July 20, 1987. Therefore, between November 3, 1977, and November 18, 1977, Mills Ranches owned both the Salazar and Terry Tracts simultaneously for fifteen days. During this fifteen-day period, Jerry Mills, as sole stockholder and principal of Mills Ranches, was the common owner of both tracts. As mentioned above, all these conveyances refer to the government subdivision lines.

A bench trial was held on March 29, 1993, in the Huerfano County District Court. The trial court found that the parties' predecessors, prior to the period of common ownership, had acquiesced that the fence marked the boundary between the two properties. Pursuant to section 38–44–109, 16A C.R.S. (1982), the trial court concluded that this acquiescence established the fence as the legal boundary. Section 38–44–109 states that:

> The corners and boundaries finally established by the court in [proceedings under this section], or an appeal therefrom, shall be binding upon all the parties, their heirs and assigns, as the corners and boundaries which have been lost, destroyed, or in dispute; but if it is found that the boundaries and corners alleged to have been recognized and acquiesced in for twenty years have been so recognized and acquiesced in, such boundaries and corners shall be permanently established.

The trial court based its decision, in part, on an earlier case brought in 1914 to quiet title to land immediately to the south of the land in dispute in this action. The trial court found that the land at issue in the 1914 case was bordered by the same fence as the one here. The trial court, however, explained that the portion of the fence at issue in the 1914 case was a continuation, running south, of the portion of the fence presently before the court. The 1914 case adjudicated the fence to be the legal boundary for the land south of the property now before us.

The trial court disregarded Jerry Mills's intent as to the Salazar Tract because that land was not deeded over by Mills but rather was the subject of foreclosure. The trial court, however, did consider Jerry Mills's intent in deeding over the land to Terry's predecessor in interest and found that Mills intended that the fence constitute the western boundary of the Terry Tract. Hence, the trial court concluded that "notwithstanding the brief period of common ownership of the property in 1977, the subject fence is the actual boundary line between [Terry's] and [Salazar's] properties, notwithstanding the legal descriptions in [Terry's] chain of title." The trial court dismissed Terry's action to quiet title. The trial court also dismissed Salazar's counterclaim for trespass as barred by the applicable statute of limitations but granted Salazar one dollar in damages for *de minimis* trespass that occurred within the limitations period.

The court of appeals assumed that the trial court properly determined as a question of fact "that the fence by acquiescence marked

the actual boundary of the parcels from at least 1914." *Terry*, 892 P.2d at 393. Nevertheless, the court of appeals reversed the trial court's decision and held that the period of common ownership effectively abrogated the acquiescence chargeable to the parties concerning the fence as the actual boundary. This was based on its analysis that "[o]nce ownership was joined, the fence no longer served as an external boundary, but only as an internal barrier." *Id.* The court of appeals further found that:

> When a common owner acquires title to adjoining tracts, any agreement as to division that had previously been made while the ownership was in two different persons ceases to exist or be effective.... Moreover, a division fence between two properties loses its legal significance when separate ownership of the parcels is merged in one owner.... Consequently, the common ownership acquired by Mills Ranches in 1977 nullified any significance the fence had previously been accorded as a boundary between separately held parcels. Mills Ranches as a subsequent grantor could therefore freely describe its conveyance by boundaries making no reference to the fence.

*Id.* (citations omitted).

The court of appeals held that the deeds were unambiguous and that the conveyances delineated the boundary in terms of the "nomenclature of the public land survey system as to the boundaries of the devised estate, without any reference to the fence." *Id.* Therefore, the court of appeals concluded that the trial court's finding, that Jerry Mills recognized the fence as the western boundary of the Terry Tract, was based upon improperly considered extrinsic evidence. Moreover, the court of appeals found that the evidence of Jerry Mills's intent, considered by the trial court, was not dispositive.[3]

## II.

■ Mills Ranches' fifteen-day period of ownership of both parcels of land controls the outcome of this case. The common ownership of the two tracts of land eradicated the significance of any acquiescence as to the legal boundary existing prior to the period of common ownership as a matter of law. An opposite conclusion would be compelled only if Jerry Mills had deeded over the land to Terry's predecessor in title containing a description in the deed that the fence constituted the boundary. Instead, the deed given by Mills continued to refer to the government subdivision lines.

■ For Salazar to succeed on his claims, he would have to prove that Terry and her predecessor in title acquiesced to the fence as the boundary after the property was deeded by Mills or that Salazar had met the statutory and common law requirements for adverse possession.[4] In practical effect, once the common ownership destroyed the prior acquiescence of the fence as boundary, the twenty-year clock, for purposes of the acquiescence statute, started ticking anew. *See* § 38–44–109, 16A C.R.S. (1982). Similarly, the eighteen-year clock, for purposes of adverse possession, also began again. *See* § 38–41–101(1), 16A C.R.S. (1982). For both purposes, the time began to run when the parcels were separated on November 18, 1977. Terry brought this action to quiet title

3. Although the trial court did not set forth in its written opinion the particular evidence it considered in determining that Jerry Mills recognized the fence as the western boundary, the court of appeals made the following statement:

> [W]e note that Mills himself did not testify. Another witness, a real estate broker, stated that Mills had generally motioned toward the fence when touring the parcel with the witness and while describing the extent of the tract.

*Terry*, 892 P.2d at 393.

4. Section 38–41–101(1), 16A C.R.S. (1982), provides that:

> No person shall commence or maintain an action for the recovery of the title or posses-

> sion or to enforce or establish any right or interest of or to real property or make an entry thereon unless commenced within eighteen years after the right to bring such action or make such entry has first accrued or within eighteen years after he or those from, by, or under whom he claims have been seized or possessed of the premises. Eighteen years adverse possession of any land shall be conclusive evidence of absolute ownership.

> In addition, "[o]ne claiming title by adverse possession must prove that his possession of the disputed parcel was actual, adverse, hostile, under claim of right, exclusive and uninterrupted for the statutory period." *Smith v. Hayden*, 772 P.2d 47, 52 (Colo.1989).

in 1991. Accordingly, only fourteen years had elapsed from the time the parcels were separated and the inception of this action. Thus, Salazar has failed to meet the statutory time requirements for either acquiescence or adverse possession.

Although there is no case law directly controlling in this jurisdiction, we are guided by cases arising in other jurisdictions and by the analysis of the doctrine of merger as it relates to easements.

In *Patton v. Smith,* 171 Mo. 231, 71 S.W. 187 (1902), the Missouri Supreme Court considered a set of facts similar to those presently before this court. In *Patton,* two landowners, Samuel Kennedy (Kennedy) and Frank Remelius (Remelius), owned adjoining tracts of land and sought the assistance of a county surveyor to determine the proper boundary between their parcels of land. The county surveyor misread the survey lines and incorrectly established the boundary. Kennedy and Remelius, relying on this inaccurate survey, built a fence on the county surveyor's established boundary which, in effect, gave Kennedy more land than was described in his deed. Thereafter, Remelius acquired Kennedy's 52–acre parcel and held both parcels until his death. Subsequently, the plaintiff acquired title to the 80–acre Remelius parcel, owned by Remelius prior to his acquisition of Kennedy's 52–acre parcel, in a foreclosure sale pursuant to a deed of trust executed by Remelius some years before. The 52–acre Kennedy parcel passed to Remelius's heirs upon his demise and Remelius's heirs conveyed the Kennedy parcel to the defendant. The plaintiff, upon discovering that the fence did not lie on the survey line described in the deeds, sought to eject the defendant. The defendant countered by claiming adverse possession. The Missouri Supreme Court held that the defendant got and paid for only what was described in his deed and that "[w]hen Remelius became the owner of both tracts, he wiped out and abandoned any agreed dividing line, if there ever was one." *Patton,* 71 S.W. at 190.

Specifically, the *Patton* court was convinced by the following:

In 1883 Remelius became the owner of both tracts, and the evidence shows that, when some question arose thereafter as to the location of the survey line, he said it made no difference, inasmuch as he owned all the land on both sides of the line, wherever it might be. So that even if the possession of Kennedy had been hostile to Remelius, and even if Kennedy had intended to claim to the line established as the survey line by [the county surveyor], without regard to whether that was the true line or not, and even if Kennedy and Remelius had agreed upon the line established by [the county surveyor], nevertheless, *when Remelius became the owner of both tracts of land, all such questions became immaterial. There was no adverse holding thereafter by Remelius as the owner of one tract against himself as the owner of the other tract, and there was no longer any question of any agreed line dividing the two tracts.*

*Id.,* 71 S.W. at 190 (emphasis supplied).

Similarly, in *Conklin v. Newman,* 278 Ill. 30, 115 N.E. 849 (1917), the Illinois Supreme Court held that when title to both tracts of land is held in one person "any agreement and division that had theretofore been made while the ownership of the two [tracts] was in different persons ceased to exist or to be effective" because "the two portions of [the fence at issue] ceased to be appurtenant to any particular parts of the tract." *Id.,* 115 N.E. at 850; *see also* 5 Richard R. Powell, *Powell on Real Property* § 62.02[10] at 62–19 (1994) ("A division fence often loses its utility and always loses its legal significance when separate ownership of the parcels is merged in one owner.") (footnote omitted); Olin L. Browder, *The Practical Location of Boundaries,* 56 Mich.L.Rev. 487, 530 (1958) ("Where, after a boundary agreement, title to the parcels affected become united, it has been held that a subsequent grantee of one of the parcels takes according to the terms of his deed unaffected by the agreement.") (footnote omitted).

 Our conclusion is reinforced by the doctrine of merger as it applies to extinguishment of easements. Easements and boundaries affect the relationship between parcels of land. Boundaries separate parcels of land. Easements, such as a "right of way," burden one estate to the benefit of the other estate. The burdened estate is servient to the domi-

nant estate which benefits from the easement. When the dominant and servient estates come under common ownership, the need for the easement is destroyed. Specifically, "[i]f the owner of an easement in gross comes into ownership of an estate in the servient tenement, the easement terminates to the extent that the ownership of that estate permits the uses authorized by the easement." 7 *Thompson on Real Property* § 60.08(b)(1) at 479 (David A. Thomas ed., 1994) (footnote omitted); *see also Breliant v. Preferred Equities Corp.*, 109 Nev. 842, 858 P.2d 1258, 1261 (1993) ("When one party acquires present possessory fee simple title to both the servient and dominant tenements, the easement merges into the fee of the servient tenement and is terminated."); *Witt v. Reavis*, 284 Or. 503, 587 P.2d 1005, 1008 (1978) ("if at any time the owner in fee of the dominant parcel acquires the fee in the servient parcel *not* subject to any other outstanding estate, the easement is then extinguished by merger") (emphasis in original).

■ Furthermore, the easement will not revive if the estates are separated once again "without the same type of action required to bring an easement into existence in the first place." 7 *Thompson on Real Property* § 60.08(b)(1) at 480 (footnote omitted); *see also* Restatement of Property § 497, Comment h (1944) ("[u]pon severance, a new easement authorizing a use corresponding to the use authorized by the extinguished easement may arise;" however, it arises only "because it was newly created at the time of the severance").

Salazar argues that merger of the Salazar and Terry Tracts did not occur and thus the legal significance of the fence as the boundary was not extinguished upon the acquisition of both properties by Mills Ranches. Salazar's position is based on the theory that merger of the properties is a matter of the common owner's intent. Salazar's position fails under the law and under the facts of the case. The doctrine of merger applies in a number of contexts. As explained above, the term merger has a separate and distinct meaning when applied to extinguishment of easements. However, the term merger is also used in the context of mortgages. It is from this context that Salazar draws support for his argument that intent governs the

occurrence of merger. Salazar cites our decisions in *Goldblatt v. Cannon*, 95 Colo. 419, 37 P.2d 524 (1934); *Hart v. Monte Vista Bldg. Ass'n*, 82 Colo. 204, 257 P. 1079 (1927); *Weston v. Livezey*, 45 Colo. 142, 100 P. 404 (1909), as support for his position. These cases all apply to mortgages and indeed hold that intent is controlling.

However, the term "merger" in the mortgage context is not synonymous with its use in the easement context. In particular,

The question whether the acquisition of the mortgaged land and of the mortgage debt by one person has in the particular case the effect of discharging the debt and extinguishing the mortgage lien is frequently one of some difficulty. When such is the result of the union of the two interests in one person, it is said that a "merger" of the mortgage occurs, or that the mortgage is "merged." The words "merge" and "merger," as used in this connection, are calculated to suggest false analogies drawn from the doctrine of merger of a less in a greater estate upon their acquisition by one person, but there appear to be no other available expressions, and they will here be used in accordance with universal practice.

5 Herbert Thorndike Tiffany, *The Law of Real Property* § 1479 at 503–04 (3d ed. 1939) (footnote omitted). Moreover,

The theory on which, upon the acquisition by one person of the mortgaged land and of the mortgage debt with the incidental lien on the land, the debt, and with it the lien, may ordinarily be regarded as extinguished, would seem to be that, under such circumstances, the person owning and controlling the debt can usually have no object in keeping it alive, it being in substance a claim against his own property, and he may consequently be presumed to intend that the debt shall be extinguished, a presumption to which, as tending to the simplification of titles, the courts are ready to give full effect. In accordance with this view are the numerous decisions that the intention of the holder of the two interests is the decisive consideration, and that no

merger will take place if there is proof of an intention on his part to the contrary. *Id.* § 1480 at 506 (footnote omitted).

There are different considerations in merger as it relates to mortgages and easements. Intent of the common owner is relevant in the mortgage context "because circumstances can arise in which merger would produce unintended and unjust results." 12 *Thompson on Real Property* § 101.03(e) at 383 (footnote omitted) (explaining that merger leads to unfair results if there are successive mortgages and a junior mortgage may be unjustly enriched when elevated to senior status when the first mortgage is merged and extinguished).

■■■ By analogizing to the doctrine of merger in the easement context, we do not intend to equate easements with boundary fences. There are no dominant and servient estates created by boundary fences. Nevertheless, the easement analysis is relevant and applicable by analogy to boundary fences. As with easements, unity of ownership destroys the need for boundary fences. In contrast, unity of ownership should not always destroy the existence of a mortgage when other interests are dependent on it. In sum, the issue here is not whether the common owner intended that the two tracts of land merge. The common owner's intent becomes relevant only if manifested in the deed. Rather, what is relevant is the effect of the unity of ownership on the legal significance of the fence.

The acquiescence to the fence as the boundary separating the two tracts of land was wiped out when common ownership of both tracts was held for a period of fifteen days. Once the two tracts fell under common ownership, the fence no longer served any legal purpose, *i.e.*, there was no need for an internal boundary to separate land belonging to one owner. When the two tracts again came under separate ownership, the

process of acquiescence and adverse possession commenced afresh.

## III.

■■■ For the foregoing reasons, we affirm the court of appeals and hold that the common ownership of two tracts of land extinguishes any acquiescence in boundary lines attributable to the prior landowners of the tracts unless the deed adopts the boundary lines as previously acquiesced upon.

KOURLIS, J., dissents.

VOLLACK, C.J., and SCOTT, J., join in the dissent.

Justice KOURLIS dissenting:

I respectfully dissent from the majority's conclusion that fifteen days of common ownership of the two tracts of land in question here served to erase a boundary long recognized as being marked by a fence over 100 years old.

This case concerns the integrity of the boundary fence between plaintiffs' and defendants' lands. The fence has been in existence since the 1880's.[1] Following trial, the court in this case found that the fence had been recognized as the actual boundary line by all previous owners of the parcels from 1914 until 1989, when plaintiffs first asserted their claim that the fence was not on the government survey line. All prior conveyances of the tracts in question described the two properties by reference to the government subdivisions without mention of the fence. Plaintiffs brought this suit in order to quiet title to their property in accordance with the surveyed government subdivision lines instead of the fence line.

In 1977, for a period of fifteen days, the two tracts of land came under the common ownership of Mills Ranches, Inc. (Mills Ranches). The majority claims that due to this short period of common ownership, the long acquiesced boundary at the fence line

---

1. In 1914, the Huerfano County court decreed that the fence represented the actual boundary line along two parcels immediately to the south of the properties at issue here. The terms of the 1914 Judgment only refer specifically to the description of the plaintiff Naranjo's property, which was located to the south of the Salazar tract in this litigation. However, the defendant in the 1914 case alleged in his answer that he owned the tract now owned by Terry as well as the tract immediately to the east of Naranjo. Thus, the 1914 judgment may have dealt with precisely the same fence at issue in this case, even though the decree would only seem to address that portion of the fence to the south of the Salazar and Terry properties.

was extinguished and the boundary reverted back to the government subdivision lines. The effect of the majority's analysis is that the deed by which Mills Ranches obtained the Terry tract was based upon the fence line boundary, whereas the deed by which Mills Ranches conveyed the Terry tract to Jerry Mills on November 18, 1977, extinguished the fence line as the boundary, even though both of the deeds used the same general language. I must respectfully disagree with this analysis.

When parties acquiesce to the location of a particular boundary line, this boundary ripens into a reality after a prescribed period of time. *Hartley v. Ruybal*, 160 Colo. 80, 86, 414 P.2d 114, 116 (1966). Such acquiescence is binding upon the parties and their successors in interest. *Forristall v. Ansley*, 170 Colo. 391, 396, 462 P.2d 116, 119 (1969).

The statutorily prescribed time period for acquiescence in Colorado is twenty years. "[I]f it is found that the boundaries and corners alleged to have been recognized and acquiesced in for twenty years have been so recognized and acquiesced in, such boundaries and corners shall be permanently established." § 38–44–109, 16A C.R.S. (1982).[2] Thus, this fence has legally been recognized as the permanent boundary between the two properties since the early part of this century.

An acquiesced boundary often will not lie on the surveyor's true location. When this occurs, the legal effect of the doctrine of acquiescence is to rewrite the deed or document of title by operation of law to reflect the acquiesced change so that the agreed upon boundary becomes the true dividing line. *Duncan v. Peterson*, 3 Cal.App.3d 607, 83 Cal.Rptr. 744, 746 (1970); *Edgeller v. Johnston*, 74 Idaho 359, 262 P.2d 1006, 1010 (1953). An acquiesced line "becomes, in law, the true line called for by the respective descriptions, regardless of the accuracy of the agreed location." *Young v. Blakeman*, 153 Cal. 477, 95 P. 888, 890 (1908). "Thus, if the distance call in the deed is '500 feet,' it may henceforth be treated as if it read '517 feet' or '483 feet,' and every future deed of the land which copies or incorporates the original description will also be so read." Roger A. Cunningham et al., *The Law of Property* § 11.8, at 765 (1984). *See also* Olin L. Browder, *The Practical Location of Boundaries*, 56 Mich.L.Rev. 487, 530 (1958).

The policy underlying this construction of the language in the deed is the doctrine of repose, or "the notion that the law ought not to tinker with the well-settled and long-held understanding of the people involved, even if it does not comport with their documents." Cunningham et al., *supra*, at 766. *See also* 12 Am.Jur.2d *Boundaries* § 85 (1964). As the California Supreme Court has reasoned, measurements made at different times, by different persons, and with different instruments will usually vary, and that:

> If the position of the line always remained to be ascertained by measurement alone, the result would be that it would not be a fixed boundary, but would be subject to change with every new measurement. Such uncertainty and instability in the title to land would be intolerable.

*Young*, 95 P. at 889. Hence, boundary lines which have been recognized for the statutory period are regarded in law as being the true and permanent boundaries described by the language in the deed.

Once the original language in the deed has been effectively changed in accordance with the acquiesced boundaries, a conveyance *by that original description* should be presumed to have been intended to refer to the boundaries as fixed by such acquiescence unless there is specific language to the contrary. *Young*, 95 P. at 891.

Mills Ranches acquired the Salazar tract by a deed in 1971.[3] The deed described the

---

**2.** The twenty year acquiescence period was first established by statute in Colorado in 1907. *See* Ch. 126, § 9, 1907 Colo.Sess. Laws 288.

**3.** The deed by which Mills Ranches acquired that portion of the property is not clear. Mills Ranches acquired the NW1/4 NW1/4 of Section 28 in the 1971 deed, but appears not to have acquired all of the SW1/4 SW1/4 of Section 21.

The deed makes reference to a conveyance of all of Section 21 lying south of the south right of way of the County Road, and presumably included the SW1/4 SW1/4 of Section 21. There is a deletion for "that portion of the E1/2 and SW1/4 of said section 21 conveyed to Huerfano County" as to which there is no further evidence in the record. This issue was not raised on appeal.

property by government survey quarter sections. All parties agree and the trial court found that the description really referred to the fence boundary that had been legally changed by the long acquiescence. Mills Ranches acquired the Terry parcel on November 3, 1977, by a deed which made reference, in pertinent part, to "The Southeast quarter of Southwest quarter of Section 21, and the East half of Northwest quarter ... of Section 28." Fifteen days later on November 18, 1977, Mills Ranches conveyed the Terry parcel to Jerry E. Mills using the following description: "SE1/4SW1/4, Section 21 and NE1/4NW1/4, Section 28." For some seventy years, the government survey descriptive language in a deed to that property had been deemed to convey the property up to the fence line.

The majority holds that because the Terry tract and the Salazar tract were held under common ownership for those fifteen days, acquiescence to the fence as the boundary between the two properties was extinguished. Maj. op. at 7–8. I believe that the doctrines of acquiescence and repose call for a different outcome. As the Michigan Supreme Court stated:

> [A] boundary line long treated and acquiesced in as the true line ought not to be disturbed on new surveys.... [T]he peace of the community requires that all attempts to disturb lines with which the parties concerned have long been satisfied should not be encouraged.

*Gregory v. Thorrez,* 277 Mich. 197, 269 N.W. 142, 143 (1936) (citations omitted); *see also Finley v. Yuba County Water Dist.,* 99 Cal. App.3d 691, 160 Cal.Rptr. 423, 428 (1979); *Sachs v. Board of Trustees of Town of Cebolleta Land Grant,* 89 N.M. 712, 557 P.2d 209, 215 (1976); *Reed v. Farr,* 35 N.Y. 113, 116–17 (1866). The integrity of a boundary line agreed upon for seven decades is not to be lightly undermined. If Mills Ranches had intended to move the boundary line from that which had been established, it should have changed the descriptive language used in the deed so as to clearly overturn the effect of acquiescence.

The public policy to be served in affording certainty to boundary locations between adjoining landowners is an important one. In my view, the boundary between the Salazar

and Terry tracts was established as the fence line decades before either Mills Ranches or Terry entered the chain of title. Nothing that Mills Ranches did during its brief period of common ownership changed the location of the dividing boundary from the fence line.

Accordingly, I would reverse the court of appeals with directions to reinstate the trial court judgment in favor of the defendants.

I am authorized to say that Chief Justice VOLLACK and Justice SCOTT join in this dissent.