#29435-r-MES
**2023 S.D. 3**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

TODD FUOSS,                                   Plaintiff and Appellee,

   v.

DAHLKE FAMILY LIMITED
PARTNERSHIP and RODNEY L. MANN,       Defendants and Appellants.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
JONES COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE M. BRIDGET MAYER
Judge

\* \* \* \*

MARTY J. JACKLEY
CATHERINE A. SEELEY
Gunderson, Palmer, Nelson
   & Ashmore, LLP
Pierre, South Dakota                    Attorneys for defendants and
                                        appellants.


A. JASON RUMPCA
ROBERT C. RITER, JR. of
Riter Rogers, LLP
Pierre, South Dakota                    Attorneys for plaintiff and
                                        appellee.

\* \* \* \*

ARGUED
APRIL 27, 2021
OPINION FILED **01/04/23**

SALTER, Justice

[¶1.]		Todd Fuoss initiated this action to acquire adverse possession over a portion of land owned by the Dahlke Family Limited Partnership and Rodney Mann.  Fuoss also sought a prescriptive easement over their property and requested injunctive relief providing him access over the land.  After a court trial, the circuit court accepted Fuoss's adverse possession ownership claim and also granted him an access easement under theories of prescriptive easement, easement by necessity, and an easement implied by prior use.  The Dahlke Family Limited Partnership and Mann appeal.  We reverse and remand the case for further proceedings.

## Facts and Procedural History

[¶2.]		Rodney Mann is a partner in the Dahlke Family Limited Partnership (the Partnership), which owns land in rural Jones County.  Todd Fuoss is an adjoining landowner who maintains a fence encroaching on land to which Mann and the Partnership hold record title.  Relevant to this appeal, the Partnership owns "The Northeast Quarter of Section 9, Township 3 South, Range 30 East, in Jones County, South Dakota," (the Partnership Property or Section 9),[1] while Fuoss owns the property directly east, described as "All of Section 10, Township 3 South, Range 30 East of the Black Hills Meridian, Jones County, South Dakota" (the Fuoss Property or Section 10).

[¶3.]		Commonly referred to as Bull Creek Road, 248th Street runs along the north end of the Partnership Property and the Fuoss Property and spans Bull Creek, which is a winding waterway with steep banks and a history of seasonal

---

1.	The parties indicate that Mann also has a separate, individual ownership interest in the Section 9 parcel.

flooding. Bull Creek runs from the north and crosses under Bull Creek Road through a large drainage pipe near the boundary between the Partnership Property and the Fuoss Property.[2] Bull Creek then runs to the southeast and cuts diagonally across the Fuoss Property, effectively dividing it into an east portion and a west portion.

[¶4.] The Partnership Property was originally purchased by Mann's grandfather, Ludwig Dahlke, by way of a 1946 contract for deed with Jasper and Laura Hullinger. In June 1948, a different Hullinger couple—Clarence and Anna Marie—conveyed the land to Ludwig and his wife. The record does not indicate when or how Jasper and Laura Hullinger transferred their interest to Clarence and Anna Marie Hullinger. The Partnership Property has remained in the Dahlke family since it acquired the property, and in 1999, Earl Dahlke deeded a one-half interest of the land to the Partnership.

[¶5.] The Fuoss Property also traces its history to Clarence and Anna Marie Hullinger, who deeded the Fuoss Property and other real property to Leo Nichols in May 1948—just one month prior to transferring the Partnership Property to Ludwig Dahlke. The Fuoss Property then passed from Leo Nichols to Darrel Lintvedt who began using it for ranching in 1964. Darrel transferred the Fuoss Property to

---

2. The exact location of the property line is unknown. A township plat map contained in the record depicts a standard straight-line grid pattern dividing the township into thirty-six sections and purports to split Sections 9 and 10 down the middle of the northernmost portion of Bull Creek. Witness testimony varied on the precise location of the property line, with some suggesting the middle of Bull Creek and others estimating it was some distance east of there. Neither party obtained a survey.

Rodney Sather in 1996, and Sather conveyed the land by warranty deed to Todd Fuoss in 2003.

[¶6.] When Darrel took possession of the Fuoss Property in 1964, an east/west fence ran along Bull Creek Road and over Bull Creek itself. From a point along the east/west fence on the west side of Bull Creek, another fence extended south to divide the two properties. Because Bull Creek cuts close to the property line between Sections 9 and 10 and was prone to flooding, the northwest portion of the fence frequently washed out, forcing Darrel to replace or repair the fence often. During his trial deposition, Darrel explained that a few years after he purchased the Fuoss Property, he approached Ludwig and asked for permission to move the northern portion of the fence farther to the west for convenience and to prevent additional damage to the fence. Ludwig looked at the land with Darrel and granted him verbal permission both to move the fence to its current location on the Partnership Property and to use the narrow portion of Partnership Property on the east side of the new fence line for grazing cattle.

[¶7.] After obtaining Ludwig's permission, Darrel's son, Brian Lintvedt, moved the northwest portion of the fence to the west, away from Bull Creek and well onto the Partnership Property. The portion of the fence that was moved ran south and connected with the existing fence where Bull Creek wends its way to the southeast, through Section 10 and away from the Partnership Property. This fence alteration created a triangular area, approximately one to one and one-half acres in size. The triangular area was located within Section 9 and legally belonged to Ludwig, but it became separated from the rest of what became the Partnership

Property by the fence and permissively used by Darrel and the subsequent owners of what became the Fuoss Property. Determining the current, competing ownership claims to this triangular area (the Disputed Area) is at the heart of this appeal.

[¶8.] Also at issue is access to the Fuoss Property through the Partnership Property. The first field approach west of Bull Creek and off Bull Creek Road leads directly south to a hay yard located on the Partnership Property and used by Mann. Prior to moving the fence to its current location, Darrel used the approach on the Partnership Property to access the Fuoss Property through what is now the hay yard using a let-down gate along the north/south fence. At the same time that Darrel received permission to move the fence, he sought permission from Ludwig to replace the let-down with an actual gate so he could access the Disputed Area and the Fuoss Property west of Bull Creek more conveniently. Ludwig again obliged and granted verbal permission to install the gate. The following is an aerial image of the area annotated by the parties and oriented so that north appears on the left side of the page.





[¶9.] Darrel sold the Fuoss Property to Rodney Sather in 1996. According to Sather, Darrel specifically told him that he would not own the Disputed Area and that his access to the west portion of Section 10 was the result of a gentlemen's agreement with Ludwig, who had granted Darrel permissive use of the property. During his ownership, Sather constructed an electric fence on the Fuoss Property along an old fence line, closer to Bull Creek and consistent with where he believed the property line to be. The electric fence functioned to keep the bison he pastured out of Bull Creek. Though he expressed some uncertainty given the intervening years, Sather testified that he generally accessed the Fuoss Property on the west side of Bull Creek through the gate in the hay yard.

[¶10.] Sather also placed "No Trespassing" signs bearing his name on the east/west fence along Bull Creek Road, including one on the corner post of the fence line bordering the Disputed Area. Sather testified that he did not place the signs to assert ownership of the Disputed Area, but rather to keep unauthorized hunters off both parcels.

[¶11.] Nevertheless, Fuoss testified that he believed he had purchased the Disputed Area. Sather testified that he never specifically told Fuoss that he was not the record title holder of the Disputed Area, or that the Disputed Area was not part of the Fuoss Property that Fuoss was purchasing. However, Sather indicated that the legal description of the Fuoss Property was restricted to Section 10, which, he explained, was consistent with his understanding that he did not own any portion of Section 9.

[¶12.] Mann testified that he and the Partnership continued to permissively allow Fuoss use of the Disputed Area and access to the Fuoss Property over the Partnership Property, just as they had for Fuoss's predecessors. However, in 2016, the Partnership and Mann fenced in their hay yard and placed a gate across the approach in that area, apparently in response to what Mann considered to be unauthorized hunting in the area. Later, Mann padlocked the gate across the approach, preventing Fuoss's access to the Disputed Area by vehicle. In response, Fuoss placed a wire gate on the east/west fence running along the north edge of the Disputed Area so he could access his cattle located on the Disputed Area and the west half of the Fuoss Property. Mann then blocked Fuoss's access via that point of entry as well.

[¶13.] Fuoss commenced this action, claiming he owned the Disputed Area by virtue of adverse possession and seeking a prescriptive easement for ingress and egress over the Partnership Property via the hay yard. The case was ultimately tried to the circuit court.

[¶14.] One of the central issues at trial centered upon whether Fuoss's possession of the Disputed Area, and that of his predecessors, was hostile—a necessary element of adverse possession. Fuoss argued that the hostility element was satisfied by the doctrine of acquiescence, which presumes hostility in situations where both parties acquiesce to a boundary line for the statutory period required for adverse possession. *See City of Deadwood v. Summit, Inc.*, 2000 S.D. 29, ¶ 22, 607 N.W.2d 22, 28. Fuoss argued that Darrel himself satisfied the elements of adverse

possession over the Disputed Area after moving the fence and using the Disputed Area for over twenty years.

[¶15.] Mann and the Partnership had a different view and argued that none of the previous owners of the Fuoss Property ever satisfied the hostility element of adverse possession because their use of the Disputed Area was always permissive. They claim Ludwig granted Darrel express verbal permission to move the fence to the west and to then use the property located east of it. But, in their view, neither of them ever agreed that the new fence line constituted a new boundary. In addition to remaining as the record owners of the Disputed Area, Mann and the Partnership maintained financial responsibility for the land by purchasing crop insurance covering the Disputed Area and by paying all property taxes associated with it.

[¶16.] Applying the doctrine of acquiescence, the circuit court accepted Fuoss's argument that there was an evidentiary presumption of hostility that, in the court's view, satisfied this element of adverse possession. The court acknowledged that the presumption of hostility can be overcome with proof that use of the Disputed Area was permissive. However, the court found that Ludwig's approval to move the fence at Darrel's request was not merely permissive, but represented an agreement between Ludwig and Darrel to change the ownership boundary between their two tracts of land.

[¶17.] The circuit court also discredited the portion of Sather's testimony concerning his discussion with Darrel about the history of permissive use for the Disputed Area and found that the placement of the "No Trespassing" signs

evidenced Sather's intent to claim the land as his own. Specifically, the court found that Sather's claim that Darrel told him "this is not your property" as it pertained to the Disputed Area was not credible.

[¶18.] As to the easement claims, the court found that a 1948 aerial photograph, discovered online by Fuoss, depicted "a well-established dirt trail" that the court characterized as the same route that currently runs through the hay yard on the Partnership Property. The court similarly found that each of Fuoss's predecessors "have traditionally used the area of property that the dirt trail traverses through as a hay stackyard" to enter the Disputed Area and "reject[ed] as a matter of law, and fact, [the] claim that Darrel Lintvedt's use of the trail was merely permissive."

[¶19.] The circuit court also allowed Fuoss to amend his pleadings to conform to the evidence and assert implied easement claims based upon necessity and prior use. The court separately concluded that all three theories supported Fuoss's claim for an easement to access the western portion of Section 10 through the Partnership Property.

[¶20.] The Partnership and Mann now appeal, raising two issues, which we restate as follows:

1.  Whether the circuit court erred when it found Fuoss and his predecessors in interest met the hostility requirement for adverse possession.

2.  Whether the circuit court erred when it granted Fuoss an easement over the Partnership Property.

**Standard of Review**

[¶21.] "Proof of the individual elements of adverse possession present questions of fact for the circuit court, while the ultimate conclusion of whether they are sufficient to constitute adverse possession is a question of law." *Gangle v. Spiry*, 2018 S.D. 55, ¶ 11, 916 N.W.2d 119, 123 (quoting *Underhill v. Mattson*, 2016 S.D. 69, ¶ 9, 886 N.W.2d 348, 352). The same is true for reviewing determinations of easement claims. *See Rancour v. Golden Reward Mining Co., L.P.*, 2005 S.D. 28, ¶ 5, 694 N.W.2d 51, 53 (applying the same standard to a prescriptive easement claim following a court trial).

[¶22.] "[W]e review a circuit court's factual findings for clear error and its legal conclusions de novo." *Gangle*, 2018 S.D. 55, ¶ 11, 916 N.W.2d at 123. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Eagle Ridge Estates Homeowners Ass'n, Inc. v. Anderson*, 2013 S.D. 21, ¶ 12, 827 N.W.2d 859, 864 (citation omitted).

**Analysis and Decision**

*Adverse Possession*

[¶23.] Generally, the "person establishing legal title" to real property is "presumed to have been possessed thereof . . . ; and the occupation of such premises by any other person shall be deemed to have been under and in subordination to the legal title, unless it appear that such premises have been held and possessed adversely . . . ." SDCL 15-3-7. "Property that has been actually and continuously occupied *under a claim of title* exclusive of any other right is subject to adverse

possession." *Gangle*, 2018 S.D. 55, ¶ 13, 916 N.W.2d at 123 (emphasis added) (citing SDCL 15-3-12).

[¶24.] A person claiming title by adverse possession must prove the following elements by clear and convincing evidence: "(1) an occupation that is (2) open and notorious, (3) continuous for the statutory period, and (4) under a claim of title exclusive of any other right."[3] *Underhill*, 2016 S.D. 69, ¶ 11, 886 N.W.2d at 352 (citing SDCL 15-3-12). "The claimant's occupation must be of such a nature as 'to give the true owner notice of actual possession and to put him on inquiry as to the invasion of his rights.'" *Gangle*, 2018 S.D. 55, ¶ 13, 916 N.W.2d at 123 (quoting *Hamad Assam Corp. v. Novotny*, 2007 S.D. 84, ¶ 7, 737 N.W.2d 922, 924).

[¶25.] Here, only the fourth element of adverse possession is at issue. This element requiring "a claim of title exclusive of any other right" is often described as "hostile possession." *See, e.g.*, *Helleberg v. Estes*, 2020 S.D. 27, ¶ 21, 943 N.W.2d 837, 843; *Swaby v. Northern Hills Regional R.R. Authority*, 2009 S.D. 57, ¶ 34 n.25, 769 N.W.2d 789, 812 n.25. Significant to our discussion here, a possessor's use cannot be considered hostile where it is permissive. *Gangle*, 2018 S.D. 55, ¶ 18, 916 N.W.2d at 124-25 (citation omitted) (emphasis added).

[¶26.] Further, we have recognized that a landowner's decision to grant another permission to use the owner's land is durable and does not wane simply with the passage of time or the succession of ownership. Consequently, a "permissive use does not ripen into a claim of hostility by the mere transfer of the

---

3. For an adverse possession theory such as the one presented here, the provisions of SDCL 15-3-1 require a statutory possession period of twenty years.

dominant estate." *Id.* ¶ 18, 916 N.W.2d at 124. The character of a permissive use can change, of course, but not without purposeful effort. For this reason, we have held "that a use permissive in the beginning can be changed into one which is hostile and adverse only by the most unequivocal conduct on the part of the user." *Id.* ¶ 18, 916 N.W.2d at 125 (citation omitted).

[¶27.] In a similar way, our cases also distinguish between an indefinite permissive use of land and acquiescence to a boundary that may eventually transfer ownership in the affected property. We have held in this regard that "the mere fact that a landowner allows his neighbor to occupy or use part of his land does not automatically fix the boundary between them or give the neighbor a right to use or take the property in perpetuity." *Summit, Inc.*, 2000 S.D. 29, ¶ 27, 607 N.W.2d at 30 (quoting *Finley v. Yuba Cnty. Water Dist.*, 160 Cal. Rptr. 423, 429 (Cal. Ct. App. 1979)).

[¶28.] Therefore, a permissive use does not simply neutralize a claim that the possession was hostile; it is antithetical to perhaps the most fundamental aspect of adverse possession—the possessor's claim to own the land. *See* SDCL 15-3-12 (requiring "actual continued occupation of premises *under a claim of title . . .* ") (emphasis added). Simply put, where a party possesses another's land with permission and holds no pretense of ownership, there can be no claim of adverse possession. Regarding a permissive use in this way allows property owners the ability to grant permission for the use of their land for indefinite periods of time, should they choose to do so, without the fear that they will be judicially divested of their property.

[¶29.]    Applying these rules here, we must reverse the circuit court's decision that Fuoss acquired title to the Disputed Area by adverse possession. Even if there was sufficient evidence that Fuoss believed he owned the Disputed Area, the length of his asserted ownership is insufficient to establish the twenty-year statutory period, as Fuoss himself acknowledges. To prevail on his adverse possession claim, Fuoss must look to his predecessors in interest and succeed under one of two theories.

[¶30.]    Under one theory, Fuoss could establish that Darrel's possession of the Disputed Area was never permissive, but rather was hostile as a result of an agreement with Ludwig to permanently alter their relative property interests by repositioning the fence. Fuoss could also prevail by proving Sather possessed the Disputed Area under a claim of title and then attach, or "tack," the two possessory periods together. *See Estate of Billings v. Deadwood Congregation of Jehovah Witnesses*, 506 N.W.2d 138, 141 (S.D. 1993) ("[T]he principle of 'tacking' allows [a claimant] to add its own claims to that of previous adverse possessors under whom [the claimant] claims a right of possession."). Given the undisputed evidence in this record, however, neither theory is sustainable.

[¶31.]    Both Sather and Darrel testified in no uncertain terms that they did *not* believe they owned the Disputed Area. Though he had unrestricted use of the Disputed Area, Darrel testified that he did so with Ludwig's express permission. Darrel also made clear that he did not intend to acquire Ludwig's land or keep him from using it.

[¶32.] Sather's testimony at trial was equally assured. He emphatically disavowed any claim to have owned the Disputed Area. In fact, as Sather and Darrel contemplated the 1996 sale of Section 10, Sather testified that the two of them drove over the area in a pickup, and Darrel explained that the use of the Disputed Area was strictly permissive.

[¶33.] The circuit court found Sather's testimony on this point not credible, principally because he had posted "No Trespassing" signs on the east/west fence along the northern edge of Sections 9 and 10, including one sign located on the western corner post moved with Ludwig's permission. But Sather, when questioned, testified that he posted the signs simply because he wanted to discourage trespassing hunters who might try to access his property or the Partnership Property, which, of course, provides access to Section 10. Leaving the court's credibility determination to the side for the moment, we believe the court's corresponding conclusion—that Sather was continuing to assert ownership established by an agreement to move the legal boundary—reflects an incorrect application of what we have sometimes described as the doctrine of acquiescence in boundaries, or simply the doctrine of acquiescence. *See Summit, Inc.*, 2000 S.D. 29, ¶¶ 19–24, 607 N.W.2d at 27–28.

[¶34.] "The doctrine [of acquiescence] gives an evidentiary presumption as to the element of hostility and applies even though the occupancy occurred due to ignorance, inadvertence, or mistake, and without an intention to claim the lands of another." *Summit, Inc.*, 2000 S.D. 29, ¶ 22, 607 N.W.2d at 28 (citations omitted). Central to its operation, as the name suggests, is acquiescence by adjoining

landowners. But the concept of acquiescence cannot be used to describe a situation like the one we have here.

[¶35.]     Indeed, Ludwig did not acquiesce to anything. By definition, the term means "[t]o accept *tacitly or passively*; to give *implied* consent to (an act)[.]" *Acquiesce*, *Black's Law Dictionary* (11th ed. 2019) (emphasis added). But Ludwig's permission to move the fence was none of these. Instead, he gave Darrel *express* permission to move the fence for the specific purpose of avoiding the flood waters of Bull Creek. And Darrel, for his part, acknowledged that the property enclosed by the relocated fence still belonged to the Dahlkes.

[¶36.]     Though the circuit court conflated them, our decisions distinguish between permissive use of land and acquiescence to a boundary that eventually transfers ownership in the affected property. As noted above, "the mere fact that a landowner allows his neighbor to occupy or use part of his land does not automatically fix the boundary between them or give the neighbor a right to use or take the property in perpetuity." *Summit, Inc.*, 2000 S.D. 29, ¶ 27, 607 N.W.2d at 30 (quoting *Finley*, 160 Cal. Rptr. at 429). Here, the evidence only indicates Ludwig allowed Darrel to occupy and use a portion of his land.

[¶37.]     Before moving the fence and building a gate on the Disputed Area, Darrel spoke with Ludwig and requested permission to construct the fence and for permission to use that land. Darrel described the extent of the use multiple times throughout his deposition and confirmed that he understood that Ludwig still owned the land and that Ludwig was acting "neighborly" by granting him permission to use the land to prevent the fence from being washed out by Bull

Creek. The patently permissive nature of Darrel's use cannot be reconciled with the circuit court's finding that Darrel and Ludwig moved the fence and created the Disputed Area intending to move the legal boundary between their parcels of property.[4]

[¶38.] Against this undisputed evidentiary backdrop, we return to the circuit court's determination regarding Sather's "No Trespassing" signs. Even if he were theoretically inclined to do so, Sather could not convert the unquestionably permissive use of the land into a hostile one without an "unequivocal act" of hostility communicated to the record owner. *Gangle*, 2018 S.D. 55, ¶ 18, 916 N.W.2d at 125; *see also Novotny*, 2007 S.D. 84, ¶ 7, 737 N.W.2d at 924 (holding, "adverse 'possession must be of such hostile, visible and continuous nature as to give the true owner notice of actual possession and to put him on inquiry as to the invasion of his rights.'") (quoting *Sioux City Boat Club v. Mulhall*, 79 S.D. 668, 117 N.W.2d 92, 96 (1962)).

[¶39.] Here, Sather's "No Trespassing" signs fall short of the mark, in large part because they are not fundamentally at odds with the exclusive use of the small Disputed Area he already had by virtue of permission. And further, no one claims

---

4. In addition to cases involving the parties' mutual mistake as to the location of a property boundary, other jurisdictions have applied the doctrine of acquiescence when clear and convincing evidence shows "that both parties recognized the line as a boundary, and not a mere barrier." *Moody v. Sundley*, 868 N.W.2d 491, 499 (N.D. 2015). We have similarly held that "possession . . . is conclusively presumed to be adverse" when "there has been acquiescence in a disputed boundary." *Lehman v. Smith*, 40 S.D. 556, 168 N.W. 857, 859. But here, of course, there was no such acquiescence.

that Sather's "No Trespassing" signs were intended to apply to members of the Dahlke/Mann family because under no version of the facts were they trespassers.

[¶40.]     Under the circumstances, Ludwig's original grant of permission to Darrel continued through the subsequent transfer of the Fuoss Property to Sather and then to Fuoss. The only way the permissive use could change into one of hostile occupation was if one of the Fuoss Property owners would have put the Partnership "on inquiry as to the invasion of [its] rights." *See Gangle*, 2018 S.D. 55, ¶ 13, 916 N.W.2d at 123 (quoting *Novotny*, 2007 S.D. 84, ¶ 7, 737 N.W.2d at 924). But that never occurred.[5]

[¶41.]     Finally, Fuoss contends on appeal that when Darrel purchased the Fuoss Property, the original north/south fence—east of the current fence and nearer to Bull Creek—was also not on the true property line. There was evidence from other witnesses, principally Brian Lintvedt, that an old fence—the one that continued to wash out with flooding from Bull Creek—was already west of the true property line. In Fuoss's view, this results in a separate sliver of property that was also acquired through adverse possession.

[¶42.]     The circuit court reached the same conclusion and determined that Fuoss and his predecessors had also adversely possessed the land "between the *old* north-south boundary fence and Bull Creek" through acquiescence. (Emphasis added). The Partnership claims that the distinction is unavailing because there

---

5.     The circuit court also found that the Partnership "never used [the Disputed Area] for any purpose whatsoever." But here, we are not concerned with the record owner's use of the property. Ludwig and his successors were entitled to permit the use of the Disputed Area without risking the ironic consequence that they would be involuntarily divested of ownership.

was insufficient evidence produced at trial to show that Fuoss satisfied the elements of adverse possession on the area of land east of the old fence. We agree.

[¶43.]     At the outset, we observe that determining whether this narrow sliver of property actually exists and, if so, where it is located is not possible with this record. Neither party obtained a survey, and there is no definitive evidence that could be used to orient a preexisting, old fence to the correct property line. But more problematic is the fact that there is no separate evidence of adverse possession relating to the area bounded by an old fence—only that the fence existed. *See Underhill,* 2016 S.D. 69, ¶ 11, 886 N.W.2d at 352 ("[T]he parties asserting adverse possession . . . have the burden of establishing these elements by clear and convincing evidence.").

[¶44.]     And even if Fuoss were to initially benefit from a presumption that his predecessors exclusively possessed the narrow strip of land east of the original fence, *see Lewis v. Moorhead*, 522 N.W.2d 1, 5 (S.D. 1994), any such presumption was rebutted by the otherwise uncontested evidence that Darrel or his own predecessors had permitted the owners of Section 10 to use *all* of the land west of Bull Creek. *See In re Estate of Dimond*, 2008 S.D. 131, ¶ 9, 759 N.W.2d 534, 537–38 (A presumption "does not shift . . . the burden of proof in the sense of the risk of nonpersuasion[.]") (alteration and omission in original) (quoting Fed. R. Evid. 301) (citing SDCL 19-11-1).

[¶45.]     In truth, Fuoss's adverse possession case was not directed at obtaining title to the narrow strip identified by the circuit court, and the case was not

developed to feature it.[6]  Regardless, Mann testified that the use of the Section 10 land east of the relocated fence was entirely by permission, and perhaps more importantly, Darrel's testimony supports the conclusion as well.  Darrel specifically identified the entire Disputed Area extending east to the approximate section line and confirmed, "That's Dahlke's."[7]  In fact, at no point during his deposition did Darrel distinguish between his ability to use the property east of the original fence or the relocated fence:

> Fuoss's counsel:    And did you know back at the time that you started using that property east of the fence that some of it wasn't actually "included" within the title of the property that you bought in '64?
>
> Darrel:    Well, where the old fence was, I mean, that's what it would be, you know.
>
> Fuoss's counsel:    Okay.  So yeah.  You knew—
>
> Darrel:    I had to have permission to move the fence away from the creek a little bit.

[¶46.]    Finally, while Brian indicated that the old fence was already west of the true property line, he also indicated, consistent with Darrel's testimony, that permission was required to move the fence.  He further indicated that use of the land east of the fence was by permission without providing a distinction between

---

6.    This is likely because any area east of an old fence that fell within the Partnership Property was not large enough to avoid frequent annual washout from the floodwaters of Bull Creek.  That is, of course, the precise reason Darrel sought permission from Ludwig to move the fence to the west.

7.    The special writing acknowledges this testimony as evidence of a permissive use as to the land implicated when the Lintvedts moved the fence, but not as it relates to the narrow strip east of the original fence.  However, Darrel's acknowledgement that the Dahlkes owned the land east of the fence was not so restricted or limited.

the property east of the original fence or the relocated fence in a manner that would support the elements of adverse possession. Therefore, we must reverse the circuit court's additional determination concerning the narrow strip of land at the outer east edge of the Disputed Area beyond an old fence line.

[¶47.]    We conclude that the circuit court erroneously applied the doctrine of acquiescence when it determined Fuoss had adversely possessed the Disputed Area. The Partnership, therefore, remains the owner of the land according to the legal description in its deed.

***The Easement Claims***

[¶48.]    The circuit court granted Fuoss a prescriptive easement over the Partnership Property to access the west side of the Fuoss Property near Bull Creek. The easement claim specifically related to a dirt trail or path used by the Fuoss Property owners that ran across the northeast corner of the Partnership Property, through the hay yard, and into the Disputed Area.

[¶49.]    "The elements that a claimant must prove to establish a prescriptive easement serve to protect the servient land owner by providing [the servient land owner] with notice of a prescriptive right." *Helleberg*, 2020 S.D. 27, ¶ 22, 943 N.W.2d at 843–44 (quoting *Novotny*, 2007 S.D. 84, ¶ 14, 737 N.W.2d at 926–27). Similar to adverse possession claims, a claimant for a prescriptive easement must show "an open, continued, and unmolested use of the land in the possession of another for the statutory period of 20 years." *Id.* ¶ 18, 943 N.W.2d at 842 (quoting *Rotenberger v. Burghduff*, 2007 S.D. 19, ¶ 8, 729 N.W.2d 175, 178). The claimant must also show that "the property is being used 'in a manner that is hostile or

adverse to the owner.'" *Id.* (quoting *Rotenberger*, 2007 S.D. 19, ¶ 8, 729 N.W.2d at 178). Like adverse possession, "a use that is merely permissive and not adverse to the interests of the property owner will not become a prescriptive easement." *Thompson v. E.I.G. Palace Mall, LLC*, 2003 S.D. 12, ¶ 7, 657 N.W.2d 300, 304.

[¶50.] As with the adverse possession issue above, the only part of the prescriptive easement analysis in dispute here is the element of hostility. The circuit court found that Darrel's use of the trail through the hay yard was not permissive, but hostile to the Partnership. Again, we disagree.

[¶51.] The only direct evidence regarding access through the Partnership Property outside of the Disputed Area was the testimony of Darrel, whose testimony cannot be fashioned into a claim of hostile use over the access route through the Partnership Property. Darrel did, however, describe his use of the access route in different terms than the express permission Ludwig had granted for the relocated fence.

[¶52.] As it related to access to the south part of Section 10 on the west side of Bull Creek, Darrel's testimony establishes that his predecessor owner had already been using the Section 9 approach west of the fence for access through a let-down gate:

Mann's counsel: And when you say the "fence letdown," because you had already asked Dahlke whether you could let the fence down and access it. And he was fine with that, wasn't he?

Darrel: Well, yeah. I mean, there was already a letdown there that he had. Or somebody had before.

Mann's counsel: That he used.

| Darrel: | Maybe before.  I don't know. |
|---|---|
| Mann's counsel: | And so you had done that – you already had permission and the ability to go through that because there was a letdown or a gate, and then Dahlke had given you that permission, hadn't he? |
| Darrel: | Well, yeah.  Yeah.  I mean, he had no objection to me putting the dam in over there on my side. |

[¶53.]     At most, Darrel was uncertain of the origin of the authority to access his land through the Partnership Property, but the deposition testimony establishes that he regarded it as permissive.  Indeed, in the full context of Darrel's testimony, that is why he asked Ludwig for permission to improve the let-down gate to allow easier access.  Brian's testimony is consistent on this point:

| Mann's counsel: | And did you travel through that let-down? |
|---|---|
| Brian: | Yes, I did, all the time. |
| Mann's counsel: | Was it your understanding that the Dahlkes or the Manns gave you permission to go through that let-down? |
| Brian: | Yes. |
| Mann's counsel: | Yes? |
| Brian: | Yes, I did. |

[¶54.]     The special writing overstates the utility of a presumption that a possessor's use is hostile and relies too heavily upon the observation that Darrel did not specifically state that his access through Section 9 was by permission.  This view reallocates the burden of proof and effectively relieves Fuoss of his obligation to prove all the elements of a prescriptive easement, including hostility.

[¶55.]    In order to rebut any presumption of a hostile use, Mann needed only to present evidence that the access was permissive. *See Dimond*, 2008 S.D. 131, ¶ 9, 759 N.W.2d at 537–38 (holding the test for rebutting a presumption "should not ordinarily be equated with meeting any particular burden of proof" and is sufficient when the presumption is "met with such evidence as a trier of fact would find sufficient to base a decision on the issue, *if no contrary evidence was submitted*") (emphasis added).  If nothing else, Brian's testimony that he traveled through the Partnership Property with permission "all the time" was surely sufficient to do that, eliminating any presumption and requiring Fuoss to prove the use was hostile.  When Fuoss's burden is set in its correct context, the failure to establish through Darrel or any other witness that the use was historically hostile is a fatal void in the proof.  Indeed, the single most conspicuous feature of this record is that none of Fuoss's predecessors ever regarded their use of Section 9 as adverse to the ownership interests of their Dahlke neighbors.

[¶56.]    The circuit court also granted Fuoss both an easement implied from prior use and an easement by necessity.[8]  To obtain an easement implied from prior use, a claimant must establish four elements:

---

8.    The circuit court erred in finding an easement by necessity.  This type of implied easement arises when a grantor conveys an inner portion of land that is surrounded by land owned by the grantor or other successor owners.  The easement of necessity implied by law will entitle a landlocked grantee to a right-of-way across the grantor's retained land for purposes of ingress and egress.  *Springer v. Cahoy*, 2013 S.D. 86, ¶ 8, 841 N.W.2d 15, 19.  Here, the Fuoss Property is not landlocked.  Although an easement across the Partnership Property would make access to the westernmost portion of the Fuoss Property more convenient, Fuoss has not established it is necessary due to a lack of a potential point of access.  Others in the area, including

(continued . . .)

(1) the relevant parcels of land had been in unitary ownership;

(2) the use giving rise to the easement was in existence at the time of the conveyance dividing ownership of the property;

(3) the use had been so long continued and so obvious as to show that it was meant to be permanent; and

(4) at the time of the severance, the easement was necessary for the proper and reasonable enjoyment of the dominant tract.

*Heumiller v. Hansen*, 2020 S.D. 56, ¶ 16, 950 N.W.2d 426, 430 (quoting *Springer v. Cahoy*, 2012 S.D. 32, ¶ 7, 814 N.W.2d 131, 133). "A party seeking an implied easement has the burden of proving the existence of the easement by clear and convincing evidence." *Springer*, 2012 S.D. 32, ¶ 7, 814 N.W.2d at 134 (citation omitted).

[¶57.] The circuit court found that all four elements required for an easement by implication from prior use had been satisfied. Even if the court were correct as to elements one and four,[9] there is no evidence to sustain the court's determination that "the use giving rise to the easement was in existence at the time of conveyance" and "had been so long continued and so obvious as to show that it was meant to be permanent[.]" *Id.* ¶ 7, 814 N.W.2d at 133.

[¶58.] On this point, the circuit court relied on a 1948 aerial photograph of the area, finding it showed an access trail to Section 10. There are reasons in the

_____

(. . . continued)
Fuoss's neighbor to the south, have constructed a means of access across Bull Creek using large drainage pipes.

9. We make no determination in this regard.

record to question the accuracy of this specific finding,[10] but even if the court were correct, the legal test for an implied easement by prior use requires more than simply a trail's existence, and on this point of law, the circuit court erred by not applying the entire third requirement of our accepted test for easements implied by prior use.

[¶59.]     Indeed, being able to detect a trail from an aerial photograph high above the ground is not the same thing as being "so obvious as to show that it was meant to be permanent[.]" *Heumiller*, 2020 S.D. 56, ¶ 16, 950 N.W.2d at 430. The circuit court's only relevant determination on this requirement was simply a conclusion that restated the element itself. But the existence of a prior use does not necessarily equate to an easement by prior use. Our accepted test requires more, including evidence and findings about the relative obviousness of the use and whether it was meant to be permanent. This obvious quality is particularly important and impactful because it serves to impute an unstated intent to a previous, and remote, landowner who did not testify and may well no longer be alive.

[¶60.]     In the end, a court's decision to grant an implied easement by prior use represents an exceptional circumstance in which the court imposes a servitude upon an owner's land where the parties have not arranged for an express easement

---

10.    The 1948 photograph was not interpreted by an expert, and none of the lay witnesses could definitively identify it as an access trail *to Section 10*. Darrel did identify a trail, but he attributed it to tracks from a historic wagon route that existed west of Bull Creek, as did Mann. Ironically, Fuoss, who located the photograph online, testified that the distinctive line in the photograph represented a fence line—not an access trail from the west.

through more conventional means. For this reason, the implied easement by prior use remedy is best reserved for those instances where it is necessary to confirm the discernible intent and expectation of the parties. Here, there was no such intent or expectation associated with a trail over the Partnership Property and the circuit court's decision to grant an easement implied by prior use was not justified.

## Conclusion

[¶61.] We conclude that the circuit court erred when it determined that Fuoss acquired title to the Disputed Area by adverse possession. The court incorrectly applied the doctrine of acquiescence to the facts here and further committed clear error by rejecting uncontroverted evidence of permissive use by Fuoss's predecessors in interest. For much the same reasons, we further hold that the court erred by granting Fuoss a prescriptive easement allowing access to his land through the Partnership Property. The access easement is also not authorized as an easement implied by prior use or necessity. We reverse and remand for the court's consideration of Mann's counterclaim for fencing, which the court did not previously address given its adverse possession and easement rulings.

[¶62.] JENSEN, Chief Justice, and MYREN, Justice, concur.

[¶63.] KERN and DEVANEY, Justices, concur in part and dissent in part.

DEVANEY, Justice (concurring in part and dissenting in part).

[¶64.] I agree that based on the evidence in the record, Darrel's use of the Disputed Area from the old north/south fence to the new fence originated from a grant of permission and the grant of permission continued through the subsequent transfers of the property to Sather and then to Fuoss. However, I believe it is

important to highlight that while questioning the witnesses, Darrel in particular, each side used terminology in line with their respective positions to recharacterize the witnesses' responses as to the nature of the agreement reached with Ludwig. It was further apparent that Darrel was generally inclined to agree with the leading questions posed to him. Nevertheless, Darrel testified, in response to a nonleading question counsel posed on cross-examination asking him who owned the ground on the east side of the relocated fence, that this land was the Dahlkes'. Therefore, I would conclude that the circuit court erred in finding that Darrel's possession of the property was hostile.

[¶65.]     I would also conclude that the evidence does not support a finding that Darrel's permissive use of the property changed into one of hostile possession during Sather's ownership of the property, even if this Court defers to the circuit court's finding that certain testimony from Sather lacked credibility. As *Gangle* requires, "[t]he law is very rigid with respect to the fact that a use permissive in the beginning can be changed into one which is hostile and adverse only by the most unequivocal conduct on the part of the user." 2018 S.D. 55, ¶ 18, 916 N.W.2d at 125 (citation omitted). The only evidence that could conceivably be considered an "unequivocal act" that put the Partnership on notice that Sather was, unlike his predecessor, claiming ownership rights in the property was his posting of a "No Trespassing" sign on the property. Although such a sign posted on another's property could be indicative of an assertion of an ownership right, here, Sather posted the sign at the only approach off Bull Creek Road that could be used by those who wanted to access *Sather's property* on the west side of Bull Creek. Given these

-26-

circumstances, I agree this could not be construed as an "unequivocal act" such that Sather's otherwise permissive use of the property became hostile. *See id.*

[¶66.]    Therefore, I join the majority opinion in as much as it reverses the circuit court's determination that Fuoss acquired title to the parcel of land up to the relocated fence by adverse possession. I also agree that because the Fuoss Property is not landlocked, there can be no easement by necessity.

[¶67.]    However, I disagree with the majority opinion's determination that the circuit court erred in concluding that Fuoss established the elements of adverse possession to the Disputed Area from the legal boundary to the old north/south fence and erred in concluding that he established the existence of a prescriptive easement and an easement implied by prior use. In my view, the majority opinion fails to adhere to our deferential, clearly erroneous standard of review on appeal when reviewing the circuit court's ruling as it relates to these particular claims. Rather than viewing the evidence *"in a light most favorable to the court's findings,"* the majority opinion ignores evidence that supports the circuit court's findings, fails to give due regard to the court's ability to observe the witnesses and evidence firsthand, and in some instances, even ignores the existence of the circuit court's findings relevant to these issues. *See Bruggeman v. Ramos*, 2022 S.D. 16, ¶ 51, 972 N.W.2d 492, 509–10 (emphasis added) (quoting *Cowan v. Mervin Mewes., Inc.*, 1996 S.D. 40, ¶ 15, 546 N.W.2d 104, 109). Because, in my view, a review of the entire evidence does not lead to a definite and firm conviction that a mistake has been made, I would, for the reasons explained below, affirm the circuit court's determinations that Fuoss established the elements of adverse possession to the

narrow strip of land between the legal boundary and the old north/south fence and also established the existence of a prescriptive easement and an easement implied by prior use.

### *Adverse Possession of Land Bounded by the Old Fence*

[¶68.] The majority opinion initially rejects the circuit court's determination that Fuoss and his predecessors adversely possessed, through acquiescence, the narrow sliver of land between the legal boundary and the old north/south fence because, in the majority opinion's view, "determining whether this narrow sliver of property actually exists and, if so, where it is located is not possible with this record." But the circuit court actually entered findings, supported by evidence in the record, depicting the location of the fence in the 1960s or early 1970s. In particular, Brian testified to where the old north/south fence was located and drew a line depicting the old fence on Mann's exhibit 16A that runs from the easternmost edge of the new gate to the current gate allowing access to Fuoss's property. The circuit court found Brian credible on this point, and neither the Partnership nor the majority opinion has established that this finding is clearly erroneous.

[¶69.] There is also evidence supporting that a location other than the old fence is the legal boundary. In that regard, the circuit court found that the Township's plat map, admitted as an exhibit at trial, shows the legal boundary as a straight north/south line generally consistent with the straight-line grid platting of the entire county and further found that "[i]t is obvious that the fence has never been right on the section line." Again, the Partnership has not shown clear error in these findings. Moreover, although the precise location of the legal property line is

not in the record, the circuit court's judgment ordered that a survey may be completed at Fuoss's expense to determine "the line of division and the legal description" of the land adversely possessed. Therefore, contrary to the majority opinion's view, it is possible to orient the location of the old north/south fence to a correct property line.

[¶70.] Nevertheless, the majority opinion further concludes reversal is necessary as it relates to this narrow strip of property because "there is no separate evidence of adverse possession relating to the area bounded by an old fence—only that the fence existed." This assertion ignores the relevant testimony from Darrel regarding his use of this property and his belief that the old north/south fence was the property line between his and Ludwig's properties. In particular, when Darrel was asked whether the property east of the old fence was included within the title of the property he purchased, he replied that "where the old fence was, I mean, that's what it would be[.]" He then explained that he had to have permission to move the fence away from the creek. The majority opinion also quotes this testimony after contending that Darrel never distinguished "between his ability to use the property east of the original fence or the relocated fence[.]" But when this testimony is considered in a light most favorable to the court's findings, as required under our standard of review, Darrel's use of the word, "it," reasonably refers to what he believed to be his property—the boundary of which he identified as the old fence.

[¶71.] In light of Darrel's testimony, the record thus supports the circuit court's findings that the land between Bull Creek and the old fence line "was protected by a substantial enclosure, i.e., the fence serving as the boundary between

Darrel Lintvedt's property and the adjoining landowner's property when Darrel Lintvedt purchased the subject property in the mid-1960's." The record further supports the court's finding that Darrel openly and notoriously occupied this strip of property for over twenty years.

[¶72.]        As to whether Darrel's occupation of this property was under a claim of title exclusive of any other right, this Court in *Underhill* explained that "[t]his element does not require wrongful intent on the part of the adverse possessor." 2016 S.D. 69, ¶ 17, 886 N.W.2d at 354. Rather, "[p]ossession of property is adverse to the true owner . . . even though such occupancy . . . was due to mistake and without an intention to claim the land of another." *Id.* (omissions in original) (quoting *Estate of Billings v. Deadwood Congregation of Jehovah Witnesses*, 506 N.W.2d 138, 141 (S.D. 1993)). Here, Darrel's testimony indicates that he treated the old fence line as the property line and he only sought permission from Ludwig when he wanted to move the northernmost portion of this fence onto a portion of Ludwig's property. And there is no testimony in the record from Darrel, or from his predecessor, Leo Nichols, indicating that they had been occupying the property up to the old fence line by permission.

[¶73.]        Despite the fact that Darrel was the only witness who could testify with firsthand knowledge as to this issue, the majority opinion relies on Mann's testimony to determine that *all* the land east of the relocated fence was used with permission. But Mann was not even born at the time Darrel asked permission from Ludwig (Mann's grandfather) to relocate the fence, and Mann had no firsthand knowledge regarding the status of the land east of fence before it was relocated.

Similarly problematic, the majority opinion finds that such use was permissive because Brian did not provide "a distinction between the property east of the original fence or relocated fence" when he indicated that the use of the land east of the fence was by permission. Like Mann, Brian was not present when his father talked to Ludwig about permission to move the existing fence. Moreover, the majority opinion, which focuses only on Brian's responses to leading questions by Mann's counsel, does not acknowledge Brian's response to a question by Fuoss's counsel whether "anybody ever [told him] during the 20 odd years that [he was] down there that that was Mann's property east of the fence and that [he was] just using it with their permission[.]" To this question, Brian responded, "I wasn't even aware of that. I always thought it was just part of our pasture[.]"

[¶74.]        Of further note, the majority opinion seems to suggest an alternative basis to reverse the circuit court as it relates to this property. It contends that "Fuoss's adverse possession case was not directed at obtaining title to the narrow strip identified by the circuit court, and the case was not developed to feature it." But Fuoss proposed findings and conclusions on this issue, seeking a ruling in his favor; thus, it is not appropriate for this Court—an appellate court—to determine that the *truth* of a party's claim does not include the party's specific request for relief.

[¶75.]        Even if this Court has doubts about whether the evidence supported the circuit court's findings, our standard of review requires that we resolve those doubts "in favor of the successful party's version of the evidence[.]" *Gartner v. Temple*, 2014 S.D. 74, ¶ 8, 855 N.W.2d 846, 850 (quoting *In re Estate of Olson*, 2008

S.D. 97, ¶ 9, 757 N.W.2d 219, 222). We must also resolve doubts in favor "of all inferences fairly deducible" from the evidence that "are favorable to the court's action." *Id.* Because a review of the record supports the circuit court's findings of fact, I would affirm the court's determination that Fuoss gained title to the property between the legal boundary and the old north/south fence by virtue of Darrel's adverse possession of this property. *See Underhill*, 2016 S.D. 69, ¶ 16, 886 N.W.2d at 354 (holding that "adverse possession occurs by operation of law and does not require an action to commence it, nor to continue it" (citation omitted)).

### *Prescriptive Easement*

[¶76.] The majority opinion correctly identifies what Fuoss was required to prove to establish a prescriptive easement on the Partnership Property affording access to the Fuoss Property on the west side of Bull Creek. However, the majority opinion does not include the law providing that once a party shows "an open and continuous use of another's land with the owner's knowledge," the party asserting a prescriptive right has made a prima facie case and there arises "a presumption that such use is adverse and under a claim of right." *Thompson*, 2003 S.D. 12, ¶ 8, 657 N.W.2d at 304. Here, it is undisputed that Fuoss and his predecessors have openly and continuously used an approach off Bull Creek Road and a corresponding trail on the Partnership Property to access the Fuoss Property with the Partnership owners' knowledge. Thus, the Partnership bore the burden of rebutting the presumption with "proof that the use was by permission or not under a claim of right." *See id.* The circuit court rejected the Partnership's claim that the use was

merely permissive as a matter of fact and law and concluded that Fuoss had met his burden of proving the existence of a prescriptive easement.

[¶77.]	On appeal, in what seems to be an acknowledgement of the lack of evidence establishing that Darrel's use of the trail was only by permission, the Partnership asserts that permission was "intrinsically sought" when Darrel requested to install a gate in the relocated north/south fence.  But in *Vivian Scott Trust v. Parker*, we explained that the defendant must *present evidence* of permission to prevent the creation of a prescriptive easement and absent such evidence a prescriptive right is created.  2004 S.D. 105, ¶ 8, 687 N.W.2d 731, 734. In a similar fashion, rather than identify in what manner the circuit court clearly erred in rejecting the Partnership's claim that the use was permissive, the majority opinion analyzes the evidence anew and deems Darrel's testimony relating to the permission he sought to move the fence and install a new gate to mean that he was also seeking permission to use the already existing trail on the Partnership Property for ingress and egress to his property.  But "our role as a reviewing court forbids us from considering the evidence anew and acknowledges a trial court's preeminent role in weighing the evidence." *Flint v. Flint*, 2022 S.D. 27, ¶ 40, 974 N.W.2d 698, 705.

[¶78.]	Darrel never testified that he sought permission to *use the approach and the trail* to access his property, and the majority opinion cites no testimony to support such a conclusion or to support a determination that the circuit court clearly erred.  In fact, after quoting Darrel's responses to questions from Mann's counsel, the majority opinion concedes that "[a]t most, Darrel was uncertain of the

origin of the authority to access his land"—a concession which supports a conclusion that Darrel's open and continuous use of this access trail with the Dahlkes' knowledge was not by permission.

[¶79.]     Nevertheless, the majority opinion then states that the full context of Darrel's deposition testimony establishes that he regarded his use of this trail as permissive.  On this point, I respectfully disagree.  Most relevant to the access issue, Mann's counsel asked Darrel, after referring to Darrel's use of the access through the Dahlkes' property, "And did you talk to him at all about *being able to drive in there* even when you were putting the fence down before you put the new fence in?"  (Emphasis added.)  Darrel answered, "*Well, no.  I asked him if we could put a gate in because that's the only way you could get in there on that side.*"  (Emphasis added.)  Then, when asked why he felt the need to ask him about putting in a gate, Darrel responded, "Well, because that fence would have been moved a little bit.  And it was up against his hay yard right there and stuff, and I didn't want to put it in without his permission."  A fair reading of this testimony is that the only time he sought permission was when he wanted to move the fence farther into the Dahlkes' hay yard and put in a gate.  He did not testify that he sought permission to use the approach and existing trail to enter his property.

[¶80.]     Brian Lintvedt likewise testified that even before moving the fence and putting in the gate, they had already been accessing their property through the Dahlkes' approach and the let-down in the existing fence because there was not an approach through which they could access the west side of Bull Creek from their own property.  As noted above, Brian testified that he was not present when his

father sought permission from Ludwig to move the fence and replace the let-down with a gate, so Darrel's testimony is more significant as to the nature of their use of the access trail. Yet, despite this testimony from both Darrel and Brian supporting the circuit court's determination that Fuoss met his burden of proof, the majority opinion focuses on whether there was some contrary evidence to rebut the presumption of an adverse use based on one exchange at the end of Brian's cross-examination wherein he agreed with Mann's counsel's characterization of the use of the let-down in the fence as permissive. Notably, prior to this particular exchange, Mann's counsel specifically elicited Brian's agreement as to the "three areas of permission" sought by Darrel, none of which included permission to use the approach through the Dahlkes' property. Instead, the three things counsel identified were the permission to move the fence farther west, to use the land on the east side of *this* fence, and to put a gate in so they would not "have to use the let-down *anymore*[.]" (Emphasis added.)

[¶81.] Instead of searching for evidence that *does not* support the circuit court's findings, our well-settled standard of review requires this Court to examine the evidence in its totality and all reasonable inferences in a light most favorable to the circuit court's findings. Because there is evidence supporting the circuit court's finding that Darrel's use of this trail for well over twenty years was not merely permissive and that Fuoss met his burden of proving the existence of a prescriptive easement by clear and convincing evidence, the Partnership has not established that this finding by the circuit court was clearly erroneous. I would therefore affirm

the circuit court's determination that Fuoss established the existence of a prescriptive easement by clear and convincing evidence.

***Implied Easement by Prior Use***

[¶82.] The majority opinion reverses the circuit court's ruling on this claim because, in the majority opinion's view, "[t]here are reasons in the record to question the accuracy" of the court's finding that a 1948 aerial photograph showed that an access trail existed at the time of conveyance. The majority opinion goes on to conclude that even if the circuit court's observations from the photo "were correct," there was "no evidence to sustain the court's determination" that Fuoss established the second and third elements of the test for easements implied by prior use or that "being able to detect a trail from an aerial photograph high above the ground is not the same thing as being 'so obvious as to show that it was meant to be permanent.'" I respectfully disagree with this assessment of the evidence.

[¶83.] Even without deferring to the circuit court's observations of the 1948 aerial photograph, an independent review of the photo clearly shows a well-worn trail leading from Bull Creek Road down to the southern portion of what is now the Fuoss Property. The fact that it can be identified from so "high above" supports a finding that in 1948 it was a well-used trail. Also, this trail indisputably coincides with other more current photographs admitted at trial showing the approach into the Partnership's hay yard and the access trail along the fence line at issue. And although he was not presented with the 1948 photograph during his deposition testimony, Darrel noted that there was a wagon trail that went from the southern part of his property west of Bull Creek on up to the Dahlkes' property. Moreover, he

and multiple other witnesses testified to the use, up to the present day, of this approach and trail to access the west side of Bull Creek.

[¶84.] Further, when shown the 1948 photograph, Mann expressed his belief that the trail shown in the photo was likely the old wagon trail. Given that wagons would have traveled on this trail long before 1948, it can be reasonably inferred that at the time the Hullingers severed the unity of title and conveyed the separate parcels of property in 1948, the trail had been "so long continued and so obvious as to show that it was meant to be permanent[.]" *See Thompson*, 2003 S.D. 12, ¶ 14, 657 N.W.2d at 305.

[¶85.] When the evidence is examined in a light most favorable to the circuit court's findings, I am not left with a firm conviction that the circuit court clearly erred in determining that Fuoss established an easement implied from prior use by clear and convincing evidence. I therefore would affirm the circuit court's ruling on this claim.

[¶86.] KERN, Justice, joins this writing.